UNITED STATES of America,
Plaintiff-Appellee,

v.

Richie ABNER, Defendant-Appellant.

No. 86–2896.

United States Court of Appeals,
Fifth Circuit.

Aug. 14, 1987.

Miller Wallace, Houston, Tex., for defendant-appellant.

James R. Gough, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before RUBIN, GARZA and JONES, Circuit Judges.

GARZA, Circuit Judge:

The narrow issue presented here is whether appellant Richie Abner suffered from ineffective assistance of counsel at trial.

*True Stories*

Raleigh Abner, appellant's father, was truly profligate in his use of business structures to acquire, transfer, or dispose of assets—he rarely purchased or sold anything in his own name. With well over one dozen companies, Raleigh Abner had a wild, wild life of corporate "alter egos" since he was not responsible to a viable board of directors or supervisory corporate officers for any business transaction he consummated. For purposes of the present appeal, however, the only transaction of consequence is the sale of the Abner family residence at 303 Lakeside Lane in Webster, Texas. This house was purchased for approximately $240,000 by Raleigh Abner in his individual capacity in late 1979 and refurbished with thousands of dollars "borrowed" from a few of Raleigh Abner's companies. In 1982 the Abners decided to pull up the roots, so the house was conveyed to "303 Lakeside Group, Inc.," a corporation created by Raleigh Abner to hold the homestead and allow him to borrow against the contract of sale with the purchaser of the property.[1] The 303 Lakeside home eventually sold for approximately one million dollars. On June 10, 1982, Raleigh Abner attended the closing for the sale of the house at Bay Area Bank and Trust of Clear Lake, Texas. Raleigh Abner signed the papers, accepted a $134,000 cash payment, and instructed one of his employees, Juliet Hausan, to open a safety deposit box to hold the $134,000 cash. Ms. Hausan opened a safety deposit box in her name and in the name of Richie Abner.

An attorney named James R. Clark had a professional relationship with Raleigh Abner and his corporations dating back to 1979. On August 19, 1982, Raleigh Abner informed Clark that he was going to have to file for personal bankruptcy. The original bankruptcy filing occurred September 15, 1982, while Raleigh Abner was in Europe; other bankruptcy schedules were also dated and filed when he was out of the country. On February 9, 1983, Raleigh

---

1. Apparently it was common practice for Raleigh Abner to have several houses in motion, shuffled between his corporations after serving for a short time as the family residence.

Abner appeared with James Clark for a creditor's meeting and deposition concerning the bankruptcy forms and schedules which had been filed with the bankruptcy court. Several seriously misleading statements and material omissions on the bankruptcy filings came to light at this time. For example, only one company of the dozen or more corporations controlled by Raleigh Abner was listed on Raleigh Abner's original statement of affairs in the bankruptcy proceeding. Another critical omission from the statement of affairs was information pertaining to Raleigh Abner's prior address at 303 Lakeside Lane, the home sold shortly before filing bankruptcy. Although the creditors were told that the bankruptcy schedules would be amended to correct the misstatements, the subsequent amendments to the bankruptcy papers on file with the court addressed only a few minor points and left many misrepresentations intact. This matter soon came to the attention of the U.S. Attorney's office.

A few days before Raleigh Abner filed for bankruptcy he asked his son, Richie Abner, to take the $134,000 cash obtained from the sale of the 303 Lakeside Lane property and wire it to a bank in New York. Raleigh Abner was in Europe attempting to purchase an 87-foot yacht from the estate of a deceased European, a once in a lifetime deal apparently sweetened by the prospect of a large cash down payment for the vessel. In any event, on September 8, 1982, Richie Abner went to the Bay Area Bank & Trust safety deposit box,[2] took possession of the $134,000 cash, and met with two employees—Judy Glover, the head cashier, and Jean Quartemont, the bank president[3]—in a private conference room at the bank. Richie Abner and Jean Quartemont told Judy Glover to wire the $134,000 to Raleigh Abner's bank account in New York City. When Judy Glover saw the briefcase full of cash, she informed Richie that federal law required her to file a Currency Transaction Report (CTR) on the transaction because the wire transfer would involve more than $10,000 cash or currency.[4] Jean Quartemont and Richie Abner conferred for a few moments and decided that Raleigh Abner probably would not want a CTR filing on the $134,000 wire transfer. Ms. Glover insisted that it was not a discretionary duty but a mandatory requirement. At this point either Judy Glover or Jean Quartemont stated that Bay Area Bank & Trust would not be required to file a CTR if presented with multiple cashier's checks totalling $134,000, so long as each cashier's check was less than $10,-000. Richie Abner decided to do exactly that—he left Bay Area Bank & Trust and contacted his sister, Kim Quartemont, and his brother-in-law, Dirk Quartemont, to assist him in purchasing a number of cashier's checks valued at less than $10,000 at several different banks in the area. What a day that was—the group purchased at

2. Richie Abner had previously removed the $134,000 cash from the safety deposit box opened by Juliet Hausan and placed it in a lockbox to which he alone had access.

3. At this point it becomes necessary to identify the relationship of all the parties involved. Raleigh Abner is Richie Abner's father. Raleigh Abner also has a daughter, Kim, who married Dirk Quartemont. Jean Quartemont, president of Bay Area Bank & Trust, is the father of Dirk Quartemont. Thus, Jean Quartemont is the father-in-law of Kim Quartemont and a relative by marriage of Richie and Raleigh Abner as well.

4. The regulations promulgated by the Secretary of the Treasury state: "Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000." 31 C.F.R. § 103.22(a); see 31 U.S.C.A. § 5313(a). A trans-

action in currency is defined as a "transaction involving the physical transfer of currency from one person to another. A transaction which is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency ..." 31 C.F.R. § 103.11(1).

This regulatory scheme requires a domestic financial institution to file a CTR on every transaction of cash or currency which exceeds $10,000. If the deposit or transfer of funds involves a monetary instrument which represents cash or currency, the financial institution that accepts the monetary instrument is not required to file a CTR because the financial institution that issued the bank draft, certified check, etc. would have the legal duty to file a CTR when the cash or currency was converted into a paper document.

least fifteen cashier's checks at several different domestic financial institutions around Houston, Texas.[5] Late in the afternoon, Richie Abner collected the cashier's checks purchased by Kim and Dirk Quartemont and returned to Bay Area Bank & Trust. It was past 2:00 p.m. and the bank was closed, but Richie Abner went up and knocked on the door. Recognizing Richie Abner as a frequent customer and an "in-law" of bank president Jean Quartemont, a teller opened the door and let Richie Abner inside. Richie Abner took the cashier's checks and approximately $9,000 in cash to Judy Glover for the wire transfer of $134,-000 to Raleigh Abner's New York bank account. No CTR was filed. However, Ms. Glover knew that Richie Abner had purposefully broken up the $134,000 into increments under $10,000 to cause the Bay Area Bank & Trust to fail to file the required CTR. A few days after making the wire transfer Ms. Glover notified the Federal Bureau of Investigation (FBI).

## Fear of Music

Appellant Richie Abner was charged together with his father, Raleigh Abner, his sister, Kim Quartemont, his brother-in-law, Dirk Quartemont, and Bay Area Bank & Trust president Jean Quartemont with two criminal offenses arising from the wire transfer of $134,000 from Houston, Texas to New York City. Count one charged all defendants with conspiracy to cause the failure of a domestic financial institution to file a proper CTR in violation of 18 U.S.C. § 371.[6] Count two charged all concerned with a substantive offense under 31 U.S.C. § 5322[7] and 18 U.S.C. § 2[8] of aiding and abetting a pattern of illegal activity involving currency exchange transactions exceeding one hundred thousand dollars ($100,-000) in a twelve (12) month period. Raleigh Abner was also charged in separate counts three and four of knowingly making false statements in his bankruptcy petition. James Clark, the attorney who filed Raleigh Abner's bankruptcy papers, was hired by Raleigh Abner as counsel to jointly represent Raleigh Abner, Richie Abner and Kim Quartemont.

Richie Abner appeared with his co-defendants and attorney Clark before U.S. Magistrate H. Lingo Platter on July 19, 1985. The magistrate explained in detail the potential conflicts of interest inherent in a single attorney's joint representation of two or more defendants.[9] Richie Abner

5. Two banks visited by both Kim Quartemont and Richie Abner were actually required to file CTRs because Richie and Kim each went to different branches of the same bank. A transaction aggregating more than $10,000 at one bank in one day, even if split between two or more different branches of the bank and involving increments less than $10,000 each, constitutes a transaction requiring a CTR. Thus, the structured transaction here failed because of the overload; at least two CTRs were required by law. *See United States v. Cure*, 804 F.2d 625 (11th Cir.1986) (culpability depends on whether bank was required to file CTR); *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979) (separate transactions were actually one transaction which required report).

6. Title 18, U.S.C. § 371 states in pertinent part:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

7. Title 31, U.S.C. § 5322 states that all persons "willfully violating" the currency transaction regulations promulgated by the Secretary of the Treasury "while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period shall be fined not more than $500,000, imprisoned for not more than 5 years, or both."

8. 18 U.S.C. § 2 states:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

9. Among the various problems discussed were the following specific representations by the magistrate:
The United States Constitution gives every criminal defendant the right to effective assistance of counsel. When one lawyer represents two or more defendants in a conspiracy case, the lawyer may be unable to represent all defendants with the same fairness. This joint representation may cause a conflict of interest that

told the court that he understood these potential problems but wished to present a unified defense with his father and sister. Appellant signed a statement which said:

I have been advised by the Court as to the nature and consequences of my legal representation. I have been advised of my right to effective representation of counsel, and I understand the details of my attorney's possible conflict of interest and the potential perils of such a conflict. I have discussed this matter with my attorney and understand that I could discuss the matter with outside counsel. I have selected James Clark as my attorney although he represents other defendants in this case. In doing so, I knowingly, intelligently and voluntarily waive the right to conflict-free, effective assistance of counsel provided by the Sixth Amendment to the Constitution.

Richie Abner explained at trial that he did intend to purchase multiple cashier's checks under $10,000 and avoid a CTR filing on the wire transfer, but he did so only because he misunderstood the purpose of a CTR form. Richie Abner testified that when Judy Glover said she was required to file IRS Form 4789 (a CTR) on the wire transfer, he thought that he would have to sign the form. Fearful that he would have to "face the music" of an IRS audit and be held liable for the $134,000 to the IRS, Richie decided to accomplish the wire transfer without causing a CTR filing. However, Richie Abner did admit on cross-examination that Ms. Glover could not have told him he had to sign IRS Form 4789 because, in fact, it was the bank official who signed the CTR form since it was the bank's responsibility to file the CTR. Judge DeAnda stopped the questioning at this point to ascertain just what Richie Abner meant.

THE COURT: I think earlier you did say [Judy Glover] told you you had to sign the form—that's why you were concerned about the IRS. That's what [the prosecutor] is referring to. Did you mean you didn't mean to say that?

ABNER: No, Your Honor. I think I understood it that I had to sign the form. Now that I see the form, I think its [sic] she meant that it had to be signed. But I took it for granted that I would have to sign it.

THE COURT: He's asking what she told you, regardless of what she meant. That's what he's asking. Earlier you said she told you you had to sign it, is that what your recollection is, she told you you had to sign it? That's what he's asking you.

ABNER: She couldn't have told me.

THE COURT: She could not have said that?

ABNER: She couldn't, because there's no way [sic] anywhere on the form for me to sign.

The next series of questions focused on part 2 of the CTR, entitled "Individual or

---

denies a defendant the right to effective assistance of counsel. In conspiracy cases such conflicts are a potential problem because different defendants may have different degrees of involvement. Each defendant has the right to a lawyer who represents him and him alone.

There are potential dangers for each defendant when represented by counsel with a conflict of interest from representing two or more defendants in the same case. For example:

One of the defendants represented by the lawyer may take the stand to testify in his own behalf. In order to represent the other defendants fairly the lawyer should question the defendant on the stand as completely as possible. He may not be able to do so because he can not ask this defendant about anything the defendant told him in confidence.

In a conspiracy case, the best defense for one defendant often is the contention that while there may be a conspiracy and the other defendants may be guilty, he is not a part of the conspiracy and is not guilty. A lawyer representing two or more defendants can not effectively make such an argument.

Evidence that helps one defendant might harm another defendant's case. When one lawyer represents two or more defendants, he might not offer or object to evidence that could help one defendant if it harmed the other defendant's case.

The Court advises defendants against representation by a lawyer who also represents other defendants in the same case. The Court urges each defendant to retain a lawyer who will represent him and only him. Each defendant has the right to conflict-free assistance of counel by his own lawyer. Each defendant may also waive that right. While a defendant might seek to withdraw his waiver and obtain other counsel, permission may be denied by the Court if postponement of the trial is required.

Organization for Whom the Transaction was Completed." Even though Richie Abner was initiating the wire transfer, the individual or entity for whom the transaction was completed had to be identified on the CTR as well. Since the money belonged either to "303 Lakeside Property Group, Inc." or "Marine Consulting, Inc." (another of Raleigh Abner's corporations), Richie Abner would not have been financially liable to the IRS for the money involved in the wire transfer. Again, the court interrupted to verify Richie Abner's testimony and state of mind. This time Richie Abner told the jury that despite what the CTR says, Ms. Glover told him he would be liable. The jury found Richie Abner guilty of counts one and two as charged in the indictment; Jean, Dirk, and Kim Quartemont were found not guilty of counts one and two; Raleigh Abner was found guilty of counts three and four.[10]

Prior to sentencing, appellant and Raleigh Abner filed a motion for writ of error coram nobis or, in the alternative, motion for new trial. They both argued that representation at trial by attorney James Clark fatally tainted their right to effective counsel. The district court held a hearing on this motion.[11] In a thorough and meticulous opinion,[12] Judge DeAnda analyzed Raleigh Abner's claim of ineffective assistance of counsel. Apparently, Clark had Raleigh Abner sign blank bankruptcy forms which Clark said would be filled in later with the proper information. The forms purport to show that Raleigh Abner signed, dated, and filed the forms on dates that he was out of the country. Since Clark himself had filled out Raleigh Abner's bankruptcy forms and filed them without Raleigh Abner's review and Clark had later failed to correct known misrepresentations in the bankruptcy statement of affairs (which came to light during the creditors meeting of February 9, 1983, and which Clark had said he "would take care of"), there was a crucial conflict-of-interest in Clark's representation of Raleigh Abner at trial. The district court concluded that Raleigh Abner's "best defense" was to blame Clark for even being indicted, a defense foreclosed because Clark acted as Raleigh Abner's attorney at trial. Clark's responsibility for the information contained in the bankruptcy forms never came to light at trial due to Clark's strategy in defending Raleigh Abner. Thus, even though Raleigh Abner had appeared before the U.S. Magistrate prior to trial and signed a waiver of conflict-free assistance of counsel, the district court found that Raleigh Abner suffered from an actual conflict of interest with Clark resulting in manifestly prejudicial ineffective assistance of counsel at trial, so Raleigh Abner's motion for a new trial was granted.[13]

Appellant Richie Abner's motion for new trial was denied. Though Judge DeAnda carefully outlined his reasoning in granting Raleigh Abner's request for new trial, he dismissed in summary fashion Richie Abner's request for similar relief. The district court stated that appellant "was not

---

10. After the presentation of evidence at trial but before submitting the case to the jury, the district court granted Raleigh Abner a directed verdict on counts one and two, finding that no evidence had been introduced to establish that Raleigh Abner knew or directed that the wire transfer was to be accomplished without a CTR filing.

11. Federal Rule of Criminal Procedure 44(c) requires the district court to undertake a specific inquiry into possible conflicts of interest which may exist when two or more defendants are jointly represented by an attorney. This inquiry should occur prior to trial. The magistrate made such an inquiry here and the defendants waived their right to conflict-free assistance of counsel at that time. However, the Notes of the Advisory Committee on the 1979 Amend-

ment to Rule 44(c) state that the "obligation placed upon the Court by Rule 44(c) is a continuing one, and thus in a particular case further inquiry may be necessary on a later occasion because of new developments suggesting a potential conflict of interest."

12. Criminal Case No. H-85-141 (Sept. 2, 1986) (S.D.Tex.).

13. Raleigh Abner was never retried on the two counts of making false statements and failing to disclose assets in the bankruptcy proceeding. The government had three other indictments pending against Raleigh Abner for irregularities related to his business transactions, and the elder Abner ultimately entered a plea bargain agreement which dismissed the two counts at issue here.

indicted for anything directly related to the bankruptcy" and therefore "was not deprived of any defenses due to Mr. Clark's representation." Appellant argues on appeal that the conflict-of-interest between Clark and Richie Abner was just as significant as the conflict between Clark and Raleigh Abner.

### Speaking in Tongues

The Sixth Amendment guarantees a criminal defendant the right to "the assistance of counsel for his defence," U.S. Const. Amend. VI, and "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Appellant's claim of ineffective assistance of counsel must be evaluated under the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The fundamental precept guiding our review is recognition that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067. In a detailed explanation of the constitutional analysis needed to evaluate ineffective assistance of counsel claims, the Supreme Court in *Strickland* expanded upon its logic in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and identified three different categories of claims and the appropriate standards necessary to determine whether a defendant was prejudiced by his attorney's representation. The Court first noted that "[i]n certain Sixth Amendment contexts, prejudice is presumed. Actual or * MESSAGE(S) *MORE SECTIONS FOLLOWconstructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance." *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984)). Second, the Court held that "when counsel is burdened by an actual conflict of interest" then a "similar, though more limited, presumption of prejudice" should apply. 466 U.S. at 692, 104 S.Ct. at 2067. The Court rejected a *per se* rule requiring reversal of all convictions on appeal, adopting instead a test where "prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler*, 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718). Absent the special circumstances requiring a presumption of prejudice, ineffective assistance of counsel claims "are subject to a general requirement that the defendant affirmatively prove prejudice." 466 U.S. at 693, 104 S.Ct. at 2067. Thus, a successful claimant must establish that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance of counsel prejudiced the defendant's right to a fair trial. *Strickland*, 466 U.S. at 690–94, 104 S.Ct. at 2066–68; *see Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir.1987).

Appellant contends that his claim falls within the presumption of prejudice category which applies to counsel that has been burdened by an actual conflict of interest. Since the district court found Clark labored under a fatal conflict of interest with Raleigh Abner and Clark represented Richie Abner at the same time, Richie Abner contends that his counsel at trial was burdened by an actual conflict of interest.[14]

---

14. The district court used the rigorous test for newly discovered evidence in evaluating Raleigh and Richie Abner's claim of ineffective assistance of counsel. *See United States v. Burns*, 668 F.2d 855, 859 (5th Cir.1982). However, the Supreme Court explained in *Strickland* that the "high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged ... [but an] ineffective assistance of counsel claim asserts the *absence* of one of the crucial assurances that the result of the proceeding is reliable," so the appropriate standard of review "should be somewhat lower." 466 U.S. at 694, 104 S.Ct. at 2068 (emphasis added).

The determination of ineffective assistance of counsel is a mixed question of law and fact.

Therefore, according to Richie Abner, he need not prove actual prejudice to prevail on his claim of ineffective assistance of counsel; he must show only that Clark's representation had an adverse effect on appellant's defense.

■ An actual conflict of interest exists "whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to [the cause of] a co-defendant whom counsel also is representing." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *Nealy v. Cabana*, 782 F.2d 1362, 1363 (5th Cir.1986). Richie Abner advances two reasons as to why a conflict inhered in Clark's representation of him. First, Richie Abner claims that Clark was disqualified as counsel for appellant because Clark should have reasonably foreseen that he would be a witness in the case.[15] This was the basis for the trial court's finding that Clark had a conflict of interest with Raleigh Abner. However, our review of the record, including the post-trial hearing on Clark's potential conflicts of interest with Raleigh Abner and Richie Abner, fails to disclose any information within Clark's knowledge that would imply a conflict of interest between Clark and Richie Abner. Clark had no knowledge of Richie Abner's plan to wire his father the $134,000 from the safety deposit box. Appellant does not contend that Clark advised him to structure the wire transfer to avoid a CTR filing; Richie Abner decided to do that without advice of counsel. Clark, then, is of no value to the prosecution or defense—the pursuit of Clark as a witness is a road to nowhere. Clark's role as appellant's attorney, taken alone, is unrelated to Richie Abner's defense for conspiracy to defraud the government by purchasing multiple cashier's checks under $10,000 to avoid a CTR filing on the wire transfer.

■ Appellant's second argument is more cogent. Since this was a joint representation case, Richie Abner argues that the actual conflict of interest between Raleigh Abner and Clark somehow "spills over" and poisons the attorney-client relationship between Richie Abner and Clark—a type of "derivative" prejudice from the ineffective assistance of counsel provided a co-defendant. Appellant maintains that Clark's representation of both Raleigh Abner and Richie Abner under such a clear conflict to one must taint the defense strategy of both. The typical scenario, to the extent cases can be generalized, involves two or more defendants charged with the same offense; in such a case, an attorney's conflict of interest exhibited by favoring one defendant over another is discernible. This is the purpose underlying a trial court's inquiry under Fed.R.Crim.P. Rule 44(c): to examine the tentative decisions of co-defendants to employ the same attorney by making certain all parties are aware of potential conflicts of interest. Here, however, we face a much more elusive problem in identifying and analyzing the adverse effect of any conflict of interest which may have existed—seen and not seen. The conflict between Clark and Raleigh Abner arose due to criminal charges which were not brought against Richie Abner; however, Richie Abner was tried and convicted of criminal charges brought both against his father and himself. It bears repeating that "in a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to *refrain* from doing." *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (emphasis in original).

---

*See Cuyler v. Sullivan*, 446 U.S. at 342, 100 S.Ct. at 1715. Our standard of review, "in determining the existence of prejudice *vel non* [requires us to] 'consider the totality of the evidence before the judge and jury.'" *Kimmelman v. Morrison*, 477 U.S. 365, ——, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986) (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068).

**15.** The Texas Code of Professional Responsibility prohibits a lawyer from accepting "employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness." *Tex.Rev. Civ.Stat.Ann.*, Art. 320, Title 14 Appendix, State Bar Rules, Art. 10, § 9 DR 5–101(B) (Vernon's 1973 and 1986 Supp.) (adopting the American Bar Association's Code of Professional Responsibility), *incorporated by reference*, Rules of Discipline for the United States District Court for the Southern District of Texas, Rule 4(B).

One of the primary justifications for the presumption of prejudice in a conflict of interest setting is the difficulty in measuring "the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067; *Nealy v. Cabana*, 782 F.2d at 1365. As Judge Rubin explained in *Nealy*, "[a] defendant is 'entitled to an attorney who [can] make a decision to use or not use [testimony or evidence] unfettered by the effect of that decision on his other client's case.'" *Id.* (quoting *Turnquest v. Wainwright*, 651 F.2d 331, 334 (5th Cir.1981)).

■ During the trial, Clark represented three defendants faced with counts one and two: Raleigh Abner, who received a directed verdict in his favor before the case was submitted to the jury; Richie Abner, who was found guilty; and Kim Quartemont, who was acquitted. Thus, any conflict of interest Clark was actually burdened with at trial due to the charges against Raleigh Abner for fraudulent statements in the bankruptcy proceeding may have affected Clark's representation of all three defendants charged with the scheme to defraud the government of CTR information. The conflict of interest waiver Richie Abner agreed to prior to trial waived his constitutional guarantee of effective assistance of counsel if any conflict of interest arose between Raleigh Abner, Richie Abner, and Kim Quartemont because they had the same attorney; the waiver did not address the conflict of interest problem between the defendant and *counsel* concerning Clark's personal interest in avoiding judicial recognition of his integral involvement in Raleigh Abner's bankruptcy petition.

Although Richie Abner was warned of the possibility of conflict arising from Clark's representation of his father and sister, he had no warning of a conflict between himself and his attorney due to his attorney's personal interests. We perceive no readily apparent conflict of interest be-

tween Richie Abner and Clark affecting appellant's defense of the criminal charges brought against him. "[A]n actual, not merely hypothetical or speculative conflict must be demonstrated" before ineffective assistance of counsel will be recognized. *United States v. Alvarez*, 580 F.2d 1251, 1255 (5th Cir.1978); *see United States v. Fannon*, 491 F.2d 129 (5th Cir.), *cert. denied*, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974). According to appellant, the government's case rested on the theory that Raleigh Abner and Richie Abner collaborated to conceal assets under the bankruptcy court's jurisdiction.[16] If so, Clark's defense strategy and direct examination of Richie Abner would be calculated to protect Clark's interests and not appellant's, producing a conflict of interest. This argument is plausible. We therefore assume without deciding that Richie Abner suffered from a conflict of interest with trial counsel which satisfies the intermediate test of an attorney "actively representing conflicting interests" since Clark was burdened by an actual conflict of interest in at least one facet of his joint representation of the defendants.

■ If a defendant establishes that counsel has actively represented conflicting interests, he need show only that counsel's representation had an "adverse effect" on the proceedings. "Adverse effect is not the equivalent of prejudice, the reasonable probability of a different result, as the term 'prejudice' is defined in *Strickland*. Injury sufficient to justify reversal is presumed from the showing of adverse effect." *Nealy v. Cabana*, 782 F.2d 1362, 1365 (5th Cir.1986) (footnote omitted). Richie Abner complains of three adverse effects which Clark's representation had on his defense: (1) Clark could have been called as an exculpatory witness; (2) Raleigh Abner could have been called as an exculpatory witness; and (3) Richie Abner's case could have been tried separately

---

16. The government argued that the Abners sought to conceal the $134,000 payment for the 303 Lakeside Lane property from Raleigh Abner's creditors and thereby defraud the bankruptcy court, much as if the Abners had been caught burning down the house to collect insur-

ance money (while claiming the money was protected by the homestead exemption) or engaging in a sham conveyance to hide the title of the property from the bankruptcy court. *See In re Olivier*, 819 F.2d 550 (5th Cir.1987).

from his father's to avoid the appearance of familial collusion to break the law. We will address each contention in turn.

### 1. Clark

The district court held a hearing to ascertain what role Clark played in the charges brought against Raleigh Abner and Richie Abner. The district court concluded that Clark knew nothing of Richie Abner's activities on September 8, 1982. Clark had no knowledge of the wire transfer from Bay Area Bank & Trust in Texas to New York, and he had no knowledge of the scheme or overt acts which took place to accomplish the wire transfer of $134,000 without causing Bay Area Bank & Trust to file a CTR. Even though Clark had a conflict of interest with Raleigh Abner in the defense of the charges arising from the bankruptcy petition, Richie Abner was not charged with any fraud arising from the bankruptcy proceeding. The government charged Richie Abner with evasion of the laws and regulations requiring a domestic financial institution to report cash transactions over $10,000 to the IRS. We can conceive of no advantage which Clark would obtain by reason of Richie Abner's conviction for offenses unrelated to the bankruptcy petition. Appellant vigorously contends that Clark's involvement in Raleigh Abner's bankruptcy proceedings made him a crucial witness for appellant—crucial to dispel the extremely prejudicial appearance that father and son collaborated to defraud the government. But the fact remains Clark had absolutely no knowledge of the circumstances underlying the criminal charges against appellant. *Cf. Crisp v. Duckworth*, 743 F.2d 580, 588 (7th Cir. 1984) (post-trial hearing reveals that disputed testimony "if admissible at all, would have been insignificant at best"). Thus, Richie Abner's defense suffered no adverse effect from Clark's failure to testify as a witness in the case.

### 2. Raleigh Abner

■ Richie Abner complains that he desperately needed the testimony of Raleigh Abner to be credible before the jury. While appellant argues that the thrust of the government's case focused on Raleigh Abner, the common element at trial was the fact that all five defendants were charged with counts one and two of participating in the scheme to purchase multiple cashier's checks under $10,000 in order to evade the CTR requirement. Appellant contends that constitutionally adequate counsel would have put Raleigh Abner on the stand to explain that he didn't ask Richie to purposefully avoid a CTR filing. However, the helpfulness of Raleigh Abner's testimony to his son's defense is highly suspect. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Burger v. Kemp*, ― U.S. ―, ―, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987) (citing *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065). Raleigh Abner has two prior convictions in the Western District of Texas on two counts of making false statements to a financial institution in order to obtain loans, in violation of 18 U.S.C. § 1014. These felony convictions could have been used to impeach the veracity of any testimony offered by Raleigh Abner. Furthermore, the fact that Raleigh Abner was named in three other pending indictments for financial irregularities would have also reflected negatively on his testimony. Raleigh Abner chose to exercise his fifth amendment right not to testify at trial. Raleigh Abner also possessed the constitutional right not to incriminate himself if he did take the stand in his son's defense, though he would have opened himself up to cross-examination. Appellant must do more than point to Raleigh Abner's failure to testify—he must specifically identify what testimony of Raleigh Abner was denied the jury and caused an adverse effect on him. "An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Foxworth v. Wainwright*, 516 F.2d 1072, 1080 (5th Cir.1975);

*United States v. Soudan,* 812 F.2d 920, 928–29 (5th Cir.1986).

Appellant says that Raleigh Abner could have testified that he did not direct or request Richie Abner to accomplish the wire transfer without a CTR filing. Yet the jury was told as much by Judge DeAnda when he granted Raleigh Abner a directed verdict on counts one and two: the district court told the jury that the United States had not met its burden of proof in attempting to establish that Raleigh Abner knew anything about the defendants' alleged plan to avoid a CTR filing, and that the court's decision to direct a verdict on counts one and two for Raleigh Abner should not affect the jury's consideration of the rest of the case. More importantly, it is immaterial that Raleigh Abner could have testified he did not direct his son Richie to avoid a CTR filing. Even if this testimony was before the jury, together with information about Raleigh Abner's prior convictions, pending indictments, and his interest in exculpating his son from criminal charges, Raleigh Abner would have opened himself up to extensive cross-examination and probably used his fifth amendment privilege against self-incrimination quite often. Raleigh Abner's testimony would have little, if any, value. *See Weeks v. Scurr,* 608 F.Supp. 884, 893 (D.C. Mo.1985) (no adverse effect on petitioner where witness of questionable credibility and dubious value failed to testify); *Hennessey v. Zimmerman,* 645 F.Supp. 472, 475 (E.D.Pa.1986) (reasonable counsel strategy not to call potential witness to testify when disadvantages would have outweighed benefits). The jury heard Ms. Glover's testimony that Richie Abner and Jean Quartemont conferred and then both stated that they *believed* Raleigh Abner did not want a CTR filing on the wire transfer—puzzling evidence, but clearly relevant to appellant's intent to violate the law. Ms. Glover's statement that she was compelled by law to file a CTR should have been a warning sign to appellant—she never said "don't worry about the government" but clearly indicated what the law required. Any testimony by Raleigh Abner, then, explaining only that he did not tell Richie to avoid a CTR filing, would have been insignificant to his son's theory of defense. Under these circumstances, we perceive no adverse effect upon Richie Abner's defense due to his father's failure to testify on appellant's behalf.

### 3. Severance

Appellant also argues that Clark's representation made certain that Richie Abner and Raleigh Abner would be jointly tried and that constitutionally sufficient counsel would have sought severance. The Supreme Court recently noted that "[j]oint trials play a vital role in the criminal justice system.... [They] generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Richardson v. Marsh,* — U.S. —, —, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). In this Circuit severance is appropriate only when a joint trial would result in specific and compelling prejudice to the defendant. *United States v. Hughes,* 817 F.2d 268, 272 (5th Cir.1987); *United States v. Wheeler,* 802 F.2d 778, 782 (5th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987).

All five defendants were charged with counts one and two, and it was clearly foreseeable that all five defendants contemplated a joint trial by the government. Appellant now argues he was entitled to a separate trial because of the appearance of a family conspiracy and because his father's testimony is necessary to exculpate him. However, this argument is of little merit since appellant cannot compel his father to testify for him if his father "takes the Fifth." Importantly, though we have not dwelled on Richie Abner's waiver of effective assistance of counsel before trial, the waiver clearly acts to negate any inference of adverse effect upon Richie Abner due to Clark's representation of Raleigh, Richie, and Kim Quartemont. Richie Abner knowingly and voluntarily waived his sixth amendment guarantee of conflict-free assistance of counsel for any potential conflict between Richie Abner and his co-de-

846

fendants. The waiver certainly precludes a claim that Richie Abner suffered from ineffective assistance because he was tried with his father, Raleigh Abner. Indeed, this is just what Richie Abner wanted—he agreed to Clark's multiple representation of all defendants with his eyes wide open. And the record reflects that Clark's representation of father Abner and sister Kim was successful: the elder Abner received a directed verdict on counts one and two and she was acquitted on both counts. Only Richie Abner was convicted. In the post-trial hearing before the district court and in arguments before this panel, appellant has not identified anything Clark failed to do at trial or offered a new theory of defense to pursue at a second trial. Appellant's defense to the criminal charges he was convicted of remains one of misunderstanding. Richie Abner's inability to identify any evidence or defense theory neglected by Clark leads us to conclude that failure to obtain a severance did not adversely affect his defense.[17] We are unable to hold that Clark's multiple representation of defendants at a joint trial had an adverse effect on Richie Abner's defense when appellant unquestionably consented to such before the magistrate.

*Remain in Light*

While we disagree with the district court's analysis of appellant's post-trial motion for relief, we agree that Richie Abner's conviction should remain undisturbed in light of our analysis of conflict of interest cases under *Strickland.* In our view, the presumption of prejudice inhering in the conflict of interest between counsel and defendant could poison counsel's representation of all defendants. We do not reach

that question, though, because appellant failed to establish any adverse effect from Clark's representation at trial.[18] The conviction of appellant is affirmed. Appellant's defense was not compromised by Clark's conflict of interest with Raleigh Abner, and therefore no prejudice resulted from Clark's representation of Richie Abner.

AFFIRMED.

---

17. *See, e.g., United States v. Olivares,* 786 F.2d 659, 663 (5th Cir.1986) (even assuming conflict of interest exists, counsel performed duties of representation adequately and was not "adversely affected" in any way); *Edgemon v. Lockhart,* 768 F.2d 252, 256 (8th Cir.1985) ("If, after an evidentiary hearing, [petitioner] is unable to show what more counsel could have done," no adverse effect arose from purported conflict of interest); *Stevenson v. Newsome,* 774 F.2d 1558, 1562 (11th Cir.1985) (defendant "points to no different defense strategy which could have been employed by another lawyer" and thus

fails to establish adverse effect of counsel's participation in defense).

18. It is permissible to dismiss an ineffective assistance of counsel claim if the defendant fails to satisfy one of the two components necessary for relief. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.