UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Ray DANIEL and Patrick Henry Daniel, Defendants–Appellants.

No. 91–1739

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

March 19, 1992.

Mitchell B. Lansden, Michael J. Hinton, Hinton, Sussman & Bailey, Houston, Tex., for C.R. Daniel and P.H. Daniel.

Delonia A. Watson, Asst. U.S. Atty., Dallas, Tex., Marvin Collins, U.S. Atty., Vicki Howard, Asst. U.S. Atty., Amarillo, Tex., for U.S.

Before POLITZ, Chief Judge, KING and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

Charles and Patrick Daniel appeal their convictions for possession of goods stolen from an interstate shipment. Charles Daniel also appeals his conviction for structuring transactions to evade reporting requirements. They argue that the evidence was legally insufficient to convict them, that the trial court incorrectly limited their right to cross-examine the government's chief witness, and that the trial court erred in giving one jury instruction and in refusing to give another. Finding no reversible error, we affirm the convictions.

## I. BACKGROUND

Charles Daniel and Patrick Daniel, brothers, were convicted by a jury of possessing goods stolen from an interstate shipment, a violation of 18 U.S.C. § 659. Charles Dan-

iel was also found guilty of structuring transactions to evade reporting requirements, a violation of 31 U.S.C. § 5324(1) & (3). Both were sentenced to 12 months imprisonment, 3 years supervised release, restitution of $8576.83 (for which they were severally and jointly liable with each other and William Kunkle), and a $100 mandatory assessment. Both filed timely notices of appeal.

The charges arose out of the following sequence of events: William Kunkle, a truck driver for Covenant Transport, was assigned to transport a truckload of carpet from Georgia to California in February 1990. While en route, Kunkle decided to sell the carpet and keep the proceeds for himself. He first sold two rolls of carpet to the manager of a truck stop in Oklahoma City. When he reached Amarillo, Texas, he went to a bar and inquired whether anyone would be interested in buying the carpet he was hauling. One of the bar patrons informed the Daniel brothers of Kunkle's desire to sell carpet. The Daniels inspected the carpet and the bill of lading, then offered Kunkle $17,500, which he accepted. In order to obtain cash for the purchase, as Kunkle demanded, Charles obtained a loan from their bank for the $17,500, but had the amount issued in two cashier's checks, one for $9000 and one for $8500. He then went to the main branch of another bank to cash one of the checks, and cashed the other at a different branch of that bank, located just across the street. After asking Kunkle whether the carpet was stolen, and being told that it was not, the Daniels met Kunkle at their carpet warehouse to complete the deal. There they gave Kunkle the cash, of which Kunkle returned $1000 to the brothers on being told that that amount was "vacation money." Kunkle also gave $1000 to the bar patron who had contacted the Daniels. The carpet was unloaded from the truck into the warehouse, and Charles Daniel removed the plastic wrapping and manufacturer's tags from the carpet rolls.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Both appellants challenge the sufficiency of the evidence to convict them. The standard for evaluating the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In viewing the evidence in the light most favorable to the verdict, we afford the government the benefit of all reasonable inferences and credibility choices. *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

■ Although both brothers moved for a judgment of acquittal on all relevant counts at the close of the government's case, only Charles Daniel renewed his motion at the close of all the evidence as is required by Fed.R.Crim.P. 29, and then only as to the currency transaction count. Where a defendant fails to renew his motion at the close of all the evidence, after defense evidence has been presented, he waives his objection to the earlier denial of his motion. *United States v. Robles–Pantoja*, 887 F.2d 1250, 1254 (5th Cir.1989). In this circumstance, appellate review is limited to determining whether there was a manifest miscarriage of justice, that is, whether the record is "devoid of evidence pointing to guilt." *Id.* (relying on *United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988)). Here, as in *Robles–Pantoja*, the evidence is sufficient to sustain the convictions even if all motions for judgment of acquittal had been renewed at the close of the evidence. *See* 887 F.2d at 1254. We review below the relevant evidence presented as to each count.

### 1. Possession of goods stolen from interstate shipment

On appeal, both brothers challenge the sufficiency of the evidence to convict them of possession of goods stolen from an interstate shipment. A conviction of that offense requires proof that (1) someone stole the property while it was moving as part of

an interstate shipment of freight, (2) the defendant thereafter possessed the property knowing that it had been stolen, and (3) the property had a value in excess of $100. 18 U.S.C. § 659.

▮ The main issue at trial was whether the brothers knew that the carpet which they purchased from William Kunkle had been stolen. To prove this element of the offense, the government presented the testimony of William Kunkle. Kunkle testified that, on February 14, 1990, he was a truck driver for Covenant Transport assigned to transport a load of carpet from Georgia to California. All of the carpet in the load was wrapped in white plastic and tagged with shipping labels. Kunkle decided to sell the carpet and keep the proceeds because he felt that Covenant was not paying him enough. As part of this plan, he sold two rolls of carpet to the manager of a truck stop in Oklahoma City.

As he continued on his route, Kunkle continued a drinking spree that he had begun prior to the sale of the two rolls in Oklahoma City. When he reached Amarillo, Texas, he went to Earl's Bar and informed one of the patrons of his desire to sell some carpet he was hauling. Willie Turner, who was indicted with the Daniels, walked into the bar and expressed interest in the carpet. Turner made a telephone call and indicated to Kunkle that the people he called were willing to come and look at the carpet. The Daniel brothers, who were carpet dealers who owned their own wholesale carpet business, arrived at Earl's Bar about one hour after Turner's phone call was made. Kunkle initially asked the brothers if they were police officers or if they were affiliated with the police. They indicated that they were not. As the Daniel brothers inspected the carpet, they asked to see the bill of lading, which Kunkle produced. After examining this document,[1] the brothers calculated a price and offered Kunkle $17,500 for the entire load. Kunkle accepted this offer. Kunkle demanded payment in cash, and the brothers indicated that it would take them a little time to get the money.

After Charles Daniel obtained the cash (the details of which are discussed below), Patrick Daniel telephoned Kunkle, at which time Patrick asked Kunkle if he (Kunkle) was a policeman and whether the carpet was stolen. Kunkle informed Patrick that he was not a police officer, and that the carpet was not stolen. Patrick recorded this conversation on tape. The men convened at the brothers' carpet warehouse to complete the deal, and while Kunkle was counting the money, Charles informed him that $1000 of the money was vacation money. Kunkle handed him back $1000 and told him to have a good vacation. Kunkle also handed $1000 to Turner in the presence of the Daniel brothers.

While the carpet was being unloaded in the warehouse, Charles removed the plastic wrap and the price tags from the carpet. He told Kunkle that he was going to burn the tags in the coal burner. Kunkle then gave $100 to each of the Daniels' employees to hasten their removal of the rest of the rolls of carpet. As Kunkle was shaking hands and preparing to depart, Charles asked him whether he ever had any other things. Kunkle replied that he sometimes got stereos and televisions, and Charles told Kunkle to "look him up." As Kunkle got into the cab of the truck, Charles asked whether he had the bills of lading. Kunkle told Charles, "I'll take care of them and you take care of your part." Kunkle testified that he did not give the Daniels any paperwork on the carpet.

After Kunkle's apprehension following a gambling and cocaine-buying binge, and upon a report of an abandoned Covenant truck at Earl's Bar, authorities contacted Covenant and obtained identification information for the shipment, including numbers located on the backs of the carpet rolls. When authorities went to the Daniels' warehouse, Charles could not produce paperwork for a roll of carpet identified as coming from the Covenant shipment. The roll identified was not wrapped in plastic and bore no manufacturer's label. Charles told the officers that if they came back in

1. Both brothers testified that they had never     seen the bill of lading.

an hour, he could produce the documentation. The officers returned and, after giving Charles *Miranda* warnings, obtained his consent to search the warehouse. None of the carpet identified as coming from the shipment bore any plastic wrapping and none of it had any manufacturer labels. Carpet from the shipment was also retrieved from two other locations, one a subsidiary warehouse in Lubbock and the other a flea market run by the Daniel brothers. A search of a dumpster located behind the brothers' place of business yielded a shipping label from the stolen carpet.

Although some of Kunkle's testimony was contradicted by the Daniels' testimony, the jury was entitled to assess the credibility of the witnesses, and we must view the evidence in the light most favorable to the jury's verdict. *Nixon*, 816 F.2d at 1029. Based on Kunkle's testimony, the jury could reasonably have concluded that the Daniel brothers knew they were purchasing goods that had been stolen from an interstate shipment. They paid a price that was much lower than the manufacturer would have charged, and they were aware of the quantity and quality of carpet from viewing the bill of lading. They purchased the carpet under strange circumstances off of a truck from someone they met with at a local bar, who introduced himself only as either "Rocky" or "George." One of the first questions Kunkle asked them was whether they were policemen. The brothers in turn asked Kunkle if he was a "cop."

Although the brothers make much of their cooperation with the authorities when the investigation was being conducted at the warehouse, as in assisting in locating the carpet and in moving carpet in the warehouse, these facts alone do not undermine guilt. Furthermore, some of the trial testimony casts doubt on the extent of the brothers' cooperation during the investigation. For example, when authorities contacted Charles and told him they were investigating a load of carpet that had been stolen from a Covenant truck, Charles did not inform the officers that he had recently purchased a load of carpet from a person driving a Covenant truck (which Charles had been in and around during the unloading and which was clearly marked as a Covenant truck). He admitted to the purchase of the rolls of carpet found at the warehouse but did not tell the officer that some of the carpet had been transferred to the flea market location.

The appellants also note that they taped the conversation where they specifically asked if the carpet was stolen. However, viewed in the light most favorable to the verdict, asking about the status of the carpet does not necessarily reflect a lack of guilty knowledge. The fact that they taped the conversation could be viewed as an effort to protect themselves from a later accusation that they knew the carpet was stolen. Patrick testified, regarding the taped conversation, that, "I wanted to know what he said in response to my question, 'Is that carpet stolen?' and I wanted him to say in a recording that it was not stolen. I wanted protection." The jury was entitled to view this evidence as suggesting that the Daniels knew or strongly suspected that the carpet was stolen.

Finally, the brothers saw Kunkle give $1000 cash each to Turner and to Charles in a circumstance where the price paid to Kunkle was already inordinately low given the quality of the carpet purchased. Charles agreed to "do his part" with the labels while Kunkle would take care of the bill of lading. Charles supervised the unloading while his employees removed labels and tags from the carpet, and a label was later found in the dumpster. These facts, added to those shown above, are sufficient for the jury to have concluded that the brothers committed the offense with which they were charged.

## 2. Evasion of currency transaction report

Charles Daniel also challenges the sufficiency of the evidence to convict him of structuring transactions for the purpose of evading currency transaction reporting requirements and causing or attempting to cause a financial institution to fail to file a currency transaction report as required by

31 U.S.C. § 5313.[2] As charged, this count of the indictment alleged a violation of 31 U.S.C. §§ 5324(1) & (3).

■ Charles testified that he was aware of the currency reporting requirement. The two checks totalling more than $10,000 were cashed the same day at two different branches of the same bank, thus triggering the statutory requirement for filing a report. *United States v. Abner*, 825 F.2d 835, 838 n. 5 (5th Cir.1987). The only remaining question is whether Charles intended to evade the reporting requirement.

The trial evidence showed that, when Charles went to the First National Bank of Claude to obtain a loan for the $17,500 with which to purchase the carpet, he requested that the loan be disbursed in two cashier's checks, one for $9000 and the other for $8500. Charles testified at trial that he obtained two checks in case he decided not to purchase the entire load of carpet. Charles then went to the First National Bank of Amarillo and presented the $9000 check to a teller who was personally acquainted with him, requesting that she cash the check. After completing his business with the teller, including a deposit made at 3:20 p.m. according to bank records, he left the bank. He then went across the street to another branch of the bank and asked to cash the $8500 check. The teller verified two accounts with the bank to make sure Charles could cover the check, and she also checked his driver's license. The teller then had to obtain some cash from another teller to cover the $8500. After she had accomplished these tasks, the teller made her first entry regarding the transaction. Bank records show this entry was made at 3:25 p.m.

Charles testified that, after he cashed the first check, he went back to his truck and "got to thinking" that if he decided to buy the entire load of carpet, he would need the remainder of the money, so he decided to cash the other check and proceeded to do so at the walk-up window across the street. Charles introduced the

testimony of the bank president who made the loan, who testified that Charles had informed him that he might not buy all of the carpet, in which case he would return one of the checks. Kunkle had testified, however, that the deal had already been arranged that the Daniel brothers would purchase all of the carpet before Charles had gone to secure the money for the deal. The tape-recorded conversation with Kunkle also revealed that the men had negotiated the price for the entire load, that being the exact amount that Charles proceeded to borrow.

The jury was entitled to disbelieve Charles's version that he "got to thinking," after cashing the initial check. The jury could reasonably have concluded that he went across the street to a separate branch to cash the other check immediately after cashing the first check, particularly considering the timing of the transactions as recorded by the bank. The fact that Charles obtained the loan in two checks, each for less than $10,000, and cashed them in the fashion that he did, given that he was aware of the reporting requirement, provides evidence that he intentionally sought to avoid that requirement. All of these facts taken together provide sufficient evidence upon which to conclude that Charles Daniel structured his check cashing transactions with the intent to cause the bank to fail to file a currency transaction report.

### B. Admissibility of Kunkle's Prior Offenses

At trial, the defense sought to show that Kunkle's testimony was actually part of a bargain with the government so that he would receive more lenient treatment for the illegal carpet sale and his later cocaine purchases. Kunkle's credibility, therefore, was an issue at trial. Kunkle had several prior convictions, mostly for misdemeanors. He also had a February 1980 felony conviction for conspiracy, theft, burglary, and receiving stolen property for which he had

---

**2.** Section 5313(a) requires a financial institution to file reports of certain monetary transactions, including transactions in currency that total

over $10,000. *United States v. Kington*, 875 F.2d 1091, 1105 (5th Cir.1989); *United States v. Abner*, 825 F.2d 835, 837 & n. 4 (5th Cir.1987).

been sentenced to three years probation and ordered to pay a fine.

Prior to trial, the government filed a motion in limine concerning questioning about Kunkle's prior convictions. The magistrate judge deferred ruling on the motion, directing the parties to raise it to the court during the trial. At trial, the court held that it would not allow the defense to elicit evidence of misdemeanor offenses or offenses over ten years old, in conformity with Rule 609. The defense argued that the court should allow evidence of Kunkle's convictions which were more than ten years old—and at least the February 1980 felony conviction—to show his pattern of criminal conduct. The court held that the February 1980 conviction was outside the ten-year limitation of Rule 609(b) of the Federal Rules of Evidence and that the defense had not shown enough to overcome the ruling on the motion in limine.

■ Rule 609(a) allows introduction of evidence that a witness has been convicted of a crime in order to impeach the credibility of the witness. Rule 609(b) states:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

The Daniels acknowledge that the date of conviction was ten years and four days old, but they argue that the date of "release from confinement" should not be calculated until the termination of a period of probation. Thus, the "release from confinement" for the February 1980 conviction, for which Kunkle was sentenced to three years probation, could be calculated as late as February 1983, and within ten years of the date of Kunkle's testimony. They rely on dicta in *Trindle v. Sonat Marine Inc.*, 697 F.Supp. 879 (E.D.Pa.1988), for this proposition.[3] The Daniels did not argue this basis for admitting the evidence to the district court. Instead, they argued that, because Kunkle's guilty plea came within four days of the ten-year period, it should be admissible in light of its relevance to their case.

The historical note to Rule 609 shows that, prior to 1972, the rule contemplated that the ten-year period should run from "the expiration of the period of his parole, probation, or sentence." This section was amended in 1972, however, and now states that a conviction is not admissible if more than ten years have elapsed since "release from confinement." The change in the language of the rule forecloses the interpretation urged by the appellants. Indeed, the Daniels can point to no authority for their argument, save the mistaken dicta in *Spindle*.[4]

---

**3.** The court in *Trindle* cited to a 1971 letter from Deputy Attorney General Kleindienst to Chief Justice Burger regarding proposed changes to the Rule 609 amendments being considered. *Trindle*, 697 F.Supp. at 881 n. 4 (quoting 10 James Wm. Moore & Helen I. Bendix, *Moore's Federal Practice* § 609.01 [1.–8] (2d ed. 1988)). The Rule 609(b) amendments as actually adopted, however, differed substantially from the proposal discussed in the letter. The proposal would have retained earlier language which started the ten-year clock running from the date of expiration of probation or parole. This aspect of Deputy Attorney General Kleindienst's proposal was not adopted (see below). *Spindle* interpreted the letter as support for the interpretation now urged by the Daniels. In fact, however, the amended rule deleted the provision Kleindienst sought to retain.

**4.** No court has directly ruled on this question in a published opinion, although the D.C. Circuit has held (in an unpublished opinion) that "confinement" does *not* include probation or parole. *See United States v. Anjou*, No. 86–3061, 838 F.2d 571 (table) (D.C.Cir.1988). The rationales of cases dealing with related questions also strongly suggest that "confinement" excludes probationary periods. *See, e.g., United States v. Wallace*, 848 F.2d 1464 (9th Cir.1988) (effect of confinement after violating conditions of probation); *United States v. Gray*, 852 F.2d 136, 139 (4th Cir.1988) (same re: conditions of parole); *see also* 3 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 320 (1979 & 1991 Supp.) (noting that "release from confinement" includes release on parole & discussing problem of confinement for violating conditions of probation or parole).

## C. Instruction on Deliberate Ignorance

The Daniel brothers contend that the court should not have given an instruction on deliberate ignorance. Over objection by Charles Daniel, the trial court gave the following instruction:

> You may find that a Defendant had knowledge of a fact if you find that the Defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.[5]

■ The standard of review of a claim that a jury instruction was inappropriate is "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Lara–Velasquez*, 919 F.2d 946, 950 (5th Cir.1990) (quoting *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir.1990)) (emphasis omitted from *Lara–Velasquez* ). It does not appear that Patrick Daniel's attorney objected to the inclusion of this instruction in the charge; however, because the asserted error does not require reversal under the articulated standard, it also would not rise to the level of plain error.

■ This court has consistently upheld such an instruction as long as sufficient evidence supported its insertion into the charge. *Lara–Velasquez*, 919 F.2d at 951; *United States v. Chen*, 913 F.2d 183, 191 (5th Cir.1990). The instruction is properly given when the facts support an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct, and that he purposely contrived to avoid learning of the illegal conduct. *Lara–Velasquez*, 919 F.2d at 952. "[T]he instruction is nothing more than a refined circumstantial evidence instruction properly tailored to the facts of a case...." *Id.* (quoting *United States v. Manriquez Arbizo*, 833 F.2d 244, 248 (10th Cir.1987)).

■ The giving of the deliberate ignorance instruction in this case was not reversible error. The evidence presented was sufficient for the jury to have concluded that the Daniel brothers had a subjective awareness of a high probability that they were involved in illegal activity. They were dealing with a man known only as "George" or "Rocky" who met with them at a local bar, who sold them carpet at a much lower price than the manufacturer would have, who demanded cash as payment, and who initially asked the brothers whether they were police officers. Kunkle testified that he gave the brothers no paperwork in connection with the sale of the carpet. The brothers themselves testified that they were suspicious of Kunkle but that his assurance had convinced them that the carpet was not stolen. Charles structured his bank transactions so as to avoid a reporting requirement that might lead to possible detection of illegal activity. When the police questioned Charles about the carpet, he provided misinformation and incomplete information. *See United States v. Farfan–Carreon*, 935 F.2d 678, 681 (5th Cir.1991) (lying to officers is evidence of subjective knowledge of wrongdoing); *Lara–Velasquez*, 919 F.2d at 953 (same re: inconsistent statements). These factors satisfy the first prong of the test for giving the instruction.

The second prong of the test—whether there was a purposeful contrivance to avoid learning of the illegal conduct—is also met in this case. Patrick testified that he did not ask any questions about the condition of the carpet, about why it had been rejected, or anything else about the insurance settlement that had supposedly made the carpet available for sale by Kunkle. The circumstances in this case were so overwhelmingly suspicious that the defendants' failure to conduct further inspection or inquiry suggests a conscious effort to avoid

---

**5.** The appellants additionally assert that this instruction was inaccurate because "it did not accurately reflect the total theory of deliberate ignorance." The instruction given by the court was a verbatim recital of Fifth Circuit Pattern Jury Instruction 1.35 (1990).

**170**

incriminating knowledge. *See Lara-Velasquez*, 919 F.2d at 953.[6]

### D. *Failure to Instruct on Good Faith*

Finally, the Daniel brothers contend on appeal that the district court erred in failing to give their requested instruction on their theory of the case, which incorporated a good faith instruction. Their complaint is that the instructions did not include a directive that, if the appellants actually believed Kunkle's representation that the carpet was not stolen, they could not be convicted of the possession count. Again, it appears that only Charles Daniel has preserved his error for appeal with respect to this issue. As will be discussed, the issue does not constitute reversible error as to Charles and therefore also does not constitute plain error as to Patrick.

A trial court's refusal to give a requested instruction constitutes reversible error when (1) the requested instruction is substantially correct, (2) the actual charge given to the jury did not substantially cover the content of the proposed instruction, and (3) the omission of the instruction would seriously impair a defendant's ability to present a given defense. *United States v. Bolin*, 876 F.2d 370, 371–72 (5th Cir. 1989). Here, the jury was properly instructed on the elements of the offense, including the requisite mental state. A good faith instruction was not necessary. *See United States v. Gunter*, 876 F.2d 1113, 1119–20 (5th Cir.), *cert. denied*, 493 U.S. 871, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989) (good faith instruction not required where offense could not be agreed to by mistake and where jury was properly instructed on the requisite mental states); *United States v. Luffred*, 911 F.2d 1011, 1016 (5th Cir.1990) (same); *United States*

*v. Rochester*, 898 F.2d 971, 978–79 (5th Cir.1990).

The Daniels rely on *United States v. Goss*, 650 F.2d 1336 (5th Cir. Unit A 1981), for the proposition that they were entitled to the good faith instruction. In *Goss*, we held that, in the context of that case, an instruction on specific intent was not sufficient to direct the jury to consider a possible defense of good faith. 650 F.2d at 1345. We have subsequently noted that *Goss* stands merely for the proposition that an instruction on specific intent will not always be sufficient to necessarily exclude a conclusion of good faith. *See Rochester*, 898 F.2d at 978–79; *Goss*, 650 F.2d at 1345. *Rochester* held that "the failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury." *Rochester*, 898 F.2d at 978 (citing *United States v. Hunt*, 794 F.2d 1095 (5th Cir.1986)). The instructions in this case were identical to those held sufficient in *Rochester*. *See* 898 F.2d at 978–79. Counsel argued good faith to the jury, and the brothers had an opportunity to testify concerning their good faith beliefs and lack of intent. The Daniels were not inhibited by the lack of a good faith instruction in presenting their theory of the case, including a defense based on a good faith belief that the carpet was not stolen.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court convicting the defendants as charged.

---

6. In his reply brief, Charles argues that the deliberate ignorance instruction did not differentiate between the counts with which he was charged. He contends that the jury might have applied the deliberate ignorance instruction to the currency reporting count, an element of which required that Charles have had the purpose of evading the currency reporting requirements. He points to *Chen* for the proposition that a deliberate ignorance instruction is appropriate only to prove knowledge, not purpose.

*Chen*, 913 F.2d at 190. In this case, however, Charles did not object to the deliberate ignorance instruction on that basis. Before the district court, and in his initial brief on appeal, he contended only that the instruction was unwarranted by the evidence. Since this argument was neither presented to the district court nor raised in Daniel's initial brief on appeal, we do not now consider it. *United States v. Mejia*, 844 F.2d 209, 214 n. 1 (5th Cir.1988).