UNITED STATES of America, Plaintiff-Appellee,

v.

Bernard Nettles BROWN, Defendant-Appellant.

No. 81–2424.

United States Court of Appeals, Fifth Circuit.

Feb. 22, 1983.

J. David Crisp, Texarkana, Tex., for defendant-appellant.

Robert Christian Harrison, M. Lawrence Wells, Asst. U.S. Attys., Tyler, Tex., for plaintiff-appellee.

Before BROWN, GEE and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Appellant, Bernard Nettles Brown, a former County Commissioner of Bowie County, Texas, was tried by a jury and found guilty of four counts of extortion under color of official right (18 U.S.C. § 1951), two counts of conspiracy (18 U.S.C. § 371)

and thirty-two counts of mail fraud (18 U.S.C. § 1341). Brown was sentenced to three years imprisonment on Count I. On the remainder of the counts, Brown's sentence was suspended and he was placed on five years probation to be commenced after the sentence on Count I was completed. In addition, Brown was fined $5,000 and ordered to pay restitution to Bowie County in the sum of $21,949.26. He appeals.

Brown's indictment arose out of an investigation by the Federal Bureau of Investigation into massive kickback schemes involving county commissioners in Texas and Oklahoma. Prior to Brown's trial, numerous commissioners in those two states had been indicted. Indeed, Brown was only part of a bountiful local harvest. From Bowie County alone, three commissioners had preceded his trip to federal court where each had entered a guilty plea.

Brown was a former heavy-equipment salesman who was appointed County Commissioner of Precinct 1 in Bowie County in the spring of 1977. He served until he was defeated at the next general election. During his term of office, according to the testimony, Brown entered into a typical and unimaginative kickback scheme with several salesmen of supplies and merchandise. A salesman would submit an invoice which falsely represented that certain supplies had been delivered to Bowie County. Brown would approve payment of that invoice and he and the salesman would split the money paid by the county for the non-delivered goods. On other occasions Brown was paid kickback amounts equal to ten percent of the cost of supplies actually delivered to the county. As far as the evidence against him in general, suffice it to say, its sufficiency is not the crux of his appeal.

Rather, Brown contends that his conviction should be reversed because of improper jury selection procedures or, alternatively, because the trial court overruled his motions for continuance. More narrowly, he contends that the jury's finding of guilt on two of the mail fraud counts (Counts VI and XXVII) is not supported by sufficient evidence; that Counts III and IV of the indictment are multiplicitous; and that the trial court's restitution order is excessive. We find merit to Brown's contention with respect to Count XXVII. We further find that remand is necessary for the limited purpose of reconsidering the amount of restitution which Brown was ordered to make as a condition of probation. The remainder of the trial court's judgment is affirmed.

## I. JURY SELECTION PROCEDURES

### A.

Brown argues that he was convicted by a jury which had been prejudicially contaminated through repeated exposure to jury selection voir dire in the cases of three other Northeast Texas county commissioners similarly charged, on similar evidence, with multiple counts of extortion, conspiracy and mail fraud. He also argues that the contamination continued when, during a supplemental individual voir dire on the day his trial began, the trial judge told twelve of the fourteen jurors (there were two alternates) that two of the other county commissioners had pled guilty to the charges against them.

The district court set September 14, 1981, as the date for jury selection for Brown's trial. Pursuant to the practice in that division, jury selection for the similar cases pending against two Titus County commissioners, Alvin Parish and Carthel Hubert Reese, and another Bowie County commissioner, J.C. Arnold, was set for the same date. Summoned for jury duty, sixty-plus individuals appeared and were assembled into panels of approximately thirty-one members each for purposes of selecting the respective juries to serve in each of the scheduled trials. Of course, there was an overlapping constituency on the third panel, as well as on the fourth.

The juries for the trials of Parish (from panel one) and Reese (from panel two) were selected before jury selection took place in Brown's case. Each of the two voir dires was conducted by Assistant United States Attorney John Hannah, who later conduct-

ed the voir dire in the Brown case and in the Arnold case. Hannah also conducted Brown's prosecution. During the voir dires, Hannah told the jury panels of the false invoice-split money schemes with which Parish and Reese were charged. Defense counsel asked members of the jury panels if they knew the expected witnesses against Parish and Reese, Dallas Thompson and Dorothy Griffin, who were later witnesses against Brown. They were also told by Parish's and Reese's defense counsel that members of the FBI would testify against their clients, as they later, in fact, did against Brown.

The third jury selected on September 14 was the Brown jury. It was selected from a panel composed of thirty-one individuals who had served on either panel one or two, and who had been voir dired in either Parish's or Reese's case. Three of the jurors selected on Brown's jury had previously been selected as jurors for the coming trial of Parish.

The fourth panel was next assembled from among those serving on the earlier panels. Voir dire was then conducted in the Arnold case. During the government's voir dire, the Brown jurors remained in the courtroom. Speaking to the jury panel, Hannah described the false invoice-split money scheme with which Arnold was charged. The scheme was similar to the one later proved against Brown at his trial.

On September 16, 1981, the jurors who had been selected in Parish's case reported for service. They were held outside the courtroom while the trial court was informed that Parish and Reese wished to enter a guilty plea. The Parish jury was then brought in, placed in the jury box, and informed by the trial court that Parish had changed his plea from "not guilty" to "guilty." As noted earlier, three of these jurors were later to serve in Brown's case.

On September 21, 1981, the Brown jurors reported for service. Apparently because of publicity surrounding Parish's and Reese's guilty pleas and in response to a motion filed by the defense to "quash the jury panel and grant a continuance or alter-

natively to allow [Brown's] attorney to individually voir dire members of the jury," the trial court questioned each member of the jury. They were asked whether any publicity, including the guilty pleas by Reese and Parish, would affect their impartiality and fairness. Each juror replied in the negative. After questioning a juror, the trial court afforded Brown's counsel an opportunity to question that juror. Brown's counsel did not avail himself of these opportunities. He did not challenge any juror.

B.

In asking that his conviction be reversed because the jury selection procedures employed in this case deprived him of his constitutionally-mandated right to trial before a fair, impartial and unbiased jury, Brown relies upon three decisions of this court: *United States v. Mobley,* 656 F.2d 988 (5th Cir.1981); *United States v. Jefferson,* 569 F.2d 260 (5th Cir.1978); and *United States v. Mutchler,* 559 F.2d 955 (5th Cir.1977). In these decisions, this court established that jurors who, in the interim after their selection have served as jurors in similar cases, may be challenged for cause.

This rule is articulated and delineated in *United States v. Mobley, supra* at 989:

*Jefferson* makes clear that jurors who, in the interim between their selection as jurors for a particular case, serve as jurors in similar cases may be challenged for cause, *Id.* at 262. The *Jefferson* rule distinguishes the situation in which jurors have "interim" service from cases in which jurors, prior to their selection as jurors for a particular case, served on the jury in a similar case. In this latter situation, although counsel is entitled to develop on voir dire information concerning the nature of a prospective juror's previous jury service, *United States v. Montelongo,* 507 F.2d 639, 641 (5th Cir. 1975), such prior service, even in similar cases during the same term of court cannot support a challenge for cause unless it can be shown that such prior service actually biased the prospective juror. *United States v. Reibschlaeger,* 528 F.2d 1031,

1032–33 (5th Cir.), cert. denied, 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976). By contrast, Jefferson holds that interim, as distinct from prior, service will support a challenge for cause because "[i]nterim service is more proximate in time, and creates a heightened danger of prejudice, which is especially great when the offenses are similar or the witnesses the same. . . ." Id. at 262.

In Mutchler, interim jury service occurred when certain jurors, after being selected as jurors in the defendants' case, sat on two preceding cases similar to that against the defendants. One of these trials was conducted by the same prosecutor who later prosecuted the defendants. One of the government's witnesses appeared in both trials. The facts in the defendants' case and the other two trials were very similar. Each involved similar jury instructions and each resulted in guilty verdicts.

In Jefferson, a defendant's jury was selected some seven weeks prior to his trial. On the day trial was to begin, the defendant's counsel requested further voir dire of the jurors regarding any jury service in the seven-week interim period between jury selection and the commencement of the defendant's trial. The district court denied the request, suggesting that the information sought was readily available in the clerk's office. The jury found the defendant guilty. On appeal, remand was ordered for the purpose of determining whether interim jury service occurred in "other cases similar in fact and in legal issue or in cases in which the same government witnesses testified, as explicated in Mutchler. . ." 569 F.2d at 263.

In Mobley, interim jury service occurred when certain jurors, after being selected in the defendant's case, served as jurors in a previously-tried narcotics case. The same undercover narcotics agent appeared as a principal prosecution witness in both trials. Both trials resulted in guilty verdicts.

In our opinion, Mutchler, Jefferson and Mobley stand for the proposition that jurors who have interim service on a convicting jury in a similar case, in which the govern-

ment presented the testimony of the same prosecuting witnesses, may be challenged for the reason of implied bias. Having passed upon the credibility of witnesses in a similar case, and having rendered a verdict on their oaths, it is improbable that these jurors can sit without their previous opinion and verdict influencing them. This is the "interim jury service" prohibited by these cases. The record in this case shows that such service did not occur.

■ Those Brown jurors who underwent voir dire in other commissioner cases obviously did not have "interim jury service" prohibited by Mutchler, Jefferson and Mobley. During voir dire, they heard no evidence against any of the commissioners. They were not apprised of their legal defenses. They had no occasion to pass upon the credibility of government witnesses who later appeared in Brown's trial. Even though, as a result of voir dire, they may have had some knowledge about who might appear as witnesses in the other commissioner cases, they could not be sure who would have appeared, and certainly had no idea as to what their testimony would have been. It is certain that none of the Brown jurors had returned an interim verdict against another commissioner.

■ This same reasoning would apply to the jurors who, after being selected in Brown's case, sat in the courtroom during the government's voir dire of the jury panel in the Arnold case. It also applies to those three Brown jurors who were selected as jurors in both Brown's case and in Parish's case but who never served because of his guilty plea.

Brown argues, however, that because Parish's guilty plea established the credibility of government witnesses who later appeared against Brown, interim service was performed by the three Parish/Brown jurors. He contends that the issue of credibility of the common government witnesses is absolutely established when the plea is entered. We are unwilling to accept this contention. It ignores the fact that these jurors did not necessarily know which witness-

es would have been called against Parish. It also ignores the fact that these jurors did not know what the witnesses would have said had they been called in Parish's case. Finally, it does not take into account that there was nothing before the jurors to indicate that Parish's defense to the charges was the same as Brown's.[1]

■ Brown also seems to argue that the trial court erred when, after questioning the jurors as to whether they could be fair and impartial in view of the publicity surrounding the intervening guilty pleas by Reese and Parish, it failed to give a cautionary admonishment that such pleas should not be considered as any evidence of Brown's guilt. A cautionary admonishment to a juror who has just asserted that such publicity would have no effect on his fairness and impartiality would be redundant. Furthermore, in the case of a defendant who was not charged as a participant or a conspirator in the acts of individuals who entered pleas of guilty, we find no necessity for such an admonishment.

## II. MOTIONS FOR CONTINUANCE

■ Brown contends that the trial court committed reversible error when it failed to grant his motions for continuance. The question of a continuance is traditionally within the trial court's discretion, and subject to reversal only for an abuse of discretion. To establish that such an abuse of discretion has occurred, Brown must show that the denial of a continuance seriously prejudiced him. *United States v. Houde,* 596 F.2d 696, 701 (5th Cir.1979), *cert. denied,* 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979).

In the main, Brown attempts to establish that he was seriously prejudiced by the government's failure to produce discovery materials ordered produced by the trial court, as well as by the jury selection procedures which resulted in a denial of his constitutional right to a trial before an unbi-

ased and impartial jury, discussed *supra.* He contends that such prejudice could have been avoided had he been granted a continuance.

For the reasons discussed in section I of this opinion, we find that Brown suffered no prejudice as a result of the jury selection procedures which were used in his trial. With regard to the government's alleged failure to disclose certain material relating to two government witnesses, we have considered Brown's contentions and also find that he suffered no prejudice therefrom.

Specifically, Brown complains of the government's failure to disclose a statement which Dorothy Griffin had given to the FBI to the effect that she had prepared false invoices for two county commissioners in Bowie County, Texas and split the amount paid by Bowie County on an equal basis with those commissioners, neither of whom was Brown. Brown argues that this statement was exculpatory evidence which the government was required to produce under the mandate of the trial court's order and by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ A reading of the record reveals that after Ms. Griffin testified, the government produced, pursuant to the Jencks Act, 18 U.S.C. § 3500(b), the statement in which she implicated the two Bowie County commissioners in the kickback scheme. She was cross-examined by Brown's attorneys and questioned extensively about this statement. Assuming, without deciding, that this statement was *Brady* material, any earlier error arising out of the government's failure to produce it prior to Ms. Griffin's cross-examination was harmless because "when alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the government complies with the Jencks Act." *United States v. Anderson,* 574 F.2d 1347, 1352 (5th Cir.1978); *United States v. Martino,* 648 F.2d 367, 384 (1981). Furthermore, in view of Brown's

---

1. Having found that Parish's guilty plea would have had no effect on these three jurors' assessment of the credibility of witnesses who later testified in Brown's trial, we find that it was unnecessary for the trial court to have cautioned these jurors that Parish's guilty plea was not to be considered as any evidence whatsoever of Brown's guilt.

counsel's cross-examination of Ms. Griffin about the statement, we cannot conclude that the failure of the government to produce it before she testified hampered Brown in defending against her testimony concerning their kickback scheme.

■ Brown also complains of the government's failure to disclose the testimony which John F. Lands gave before a grand jury convened by Cass County, Texas and/or a memorandum of an interview which FBI agents prepared after they had talked with Lands about his grand jury testimony. Lands supposedly told the grand jury that he had not been involved in a kickback scheme with any county commissioner in Bowie or Cass County, Texas. With respect to the grand jury testimony, this court has held that the *Brady* rule does not require the government to search the files of state agencies for exculpatory material. *United States v. Escobar,* 674 F.2d 469 (5th Cir.1982).

On the first day of the trial, the trial court conferred with the two FBI agents about the memorandum of their interview with Lands and determined that there was nothing in it which would be *Brady* material. On appeal, Brown has not shown that the trial court erred in its determination. As a result, no prejudice could have resulted from the government's failure to produce this memorandum.

■ In conclusion, having failed to show that denial of a continuance seriously prejudiced him, Brown has not established that the trial court abused its discretion. Accordingly, his claim that the trial court committed reversible error in denying his motions for continuance has no merit.

## III. INSUFFICIENCY OF EVIDENCE

Brown contends that the evidence was insufficient to support his conviction on Counts VI and XXVII. Count VI charged that Brown had committed the substantive offense of mail fraud by accepting $168 from Dallas Thompson. According to the indictment, this sum represented fifty percent of the monetary amount shown on an invoice pursuant to which Bowie County did not receive delivery of any goods or supplies. In support, the following exhibits were placed in evidence: (1) an invoice from Thompson in the sum of $336 signed by Brown and (2) a Bowie County check in that same amount made payable to Thompson.

Brown contends that there is no testimony or evidence in the record that Thompson paid him $168 as a result of his approval of the invoice or that there was any sort of a scheme between him and Thompson to defraud Bowie County based on the invoice.

Our review of the record shows that Thompson's contention was that every invoice about which he testified was totally fictitious and that nothing was delivered to Bowie County. Thompson also testified that in his meetings with Brown they would prepare a fictitious invoice, and that he would then pay Brown cash for his share of the monetary amount shown on the invoice. The invoice would then be mailed to the county and Brown would approve payment. Thompson also testified that Brown usually received one-half of the monetary amount shown on the invoice.

■ The controlling standard for assessing the sufficiency of the evidence to support a conviction requires a determination whether, viewing the evidence most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Viewing the evidence according to this standard, we conclude that there was sufficient evidence to support Brown's conviction on Count VI.

As to Count XXVII, the government concedes that the evidence in the record is insufficient to support Brown's conviction on that count. Accordingly, the judgment of the trial court as to Count XXVII is reversed and the judgment of conviction on that single count is vacated.

## IV. MULTIPLICITOUS COUNTS

Brown claims that Counts III and IV of the indictment were multiplicitous.[2] Brown concedes that the usual vice of multiplicity, i.e., that it may lead to multiple sentences for the same offense, did not occur in this case. He contends, instead, that the vice of these multiplicitous counts was the confusion to the jury in separating and analyzing the evidence introduced in support of each count. According to Brown, the same series of transactions between him and Sharon Griffin were charged as separate counts notwithstanding the overlapping time periods and the identity of the underlying transactions.

Our review of the record testimony of Sharon Griffin indicates that she was called upon by the government to identify a series of invoices. She identified each of the invoices as either being a fictitious invoice or an invoice representing material which was actually delivered to Bowie County. On fictitious invoices, Brown received fifty percent of the monetary amount shown thereon. On the other invoices, he received ten percent of that amount. The only month alleged in Count III not alleged in Count IV was February 1979. The evidence introduced showed that the only invoice which was sent to Brown in that month was one upon which he was paid approximately fifty percent of its monetary amount.

From such evidence, it would have been clear to the jury that Count IV only concerned those transactions on which ten percent was paid to Brown and that Count III only concerned those on which fifty percent was paid. With this background, the jury would not have had any trouble in separating and analyzing the evidence introduced in support of each count. Furthermore, each count concerned a different scheme with different facts. As a result, they can hardly be characterized as covering the same series of transactions or identical transactions. Brown's claim of multiplicitous counts is rejected.

## V. EXCESSIVE RESTITUTION

As noted above, imposition of sentence was suspended as to Counts II through XXXVIII and Brown was given five years probation on the condition that he pay a $5,000 fine and make restitution in the sum of $21,949.26 to Bowie County, Texas. From the briefs, we have learned that the calculation of amount probably comes from a presentence report. This report is not in the record and we are unable to determine what this sum represents. We are left to speculate and/or assume that a part or all of the difference between the two sums of money is accounted for by the amounts of money received by the vendors or salesmen pursuant to the false invoice scheme. In addition, the district court's judgment as to Count XXVII is being reversed because the evidence is insufficient to support a finding that Brown received any money.

The authority for requiring restitution as a probation condition is set forth in 18 U.S.C. § 3651 which provides that a defendant "[m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." Based on this language, the district court was empowered to require Brown to make restitution for the amounts the vendors and salesmen received from Bowie County's treasury as well as the amounts he received but only for each count upon which he was convicted. *See United States v. Boswell,* 565 F.2d 1338 (5th Cir.1978).

On the basis of the record before us, however, we are unable to conclude that Bowie County, Texas suffered actual losses or damages in the amount of $21,949.26

---

2. Count III charged Brown with violating 18 U.S.C. § 1951 by unlawfully obtaining approximately $1,004 from Sharon Griffin, a representative of Griffin Lumber, a vendor of road building and maintenance materials and supplies, during a period from about February 1979 up to and including December 1979.

Count IV charged Brown with violating 18 U.S.C. § 1951 by unlawfully obtaining approximately $558 from Sharon Griffin, during a period from about March 1979 up to and including December 1979.

from the offenses for which Brown stands convicted. Therefore, we remand this case to the district court for it to reconsider the amount of restitution imposed as a special condition of probation on Counts II through XXXVIII. Some factual basis must be set forth to support a specific amount that Bowie County suffered in losses or damages resulting from the offenses for which Brown was convicted.

For the foregoing reasons, the decision of the district court is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.