UNITED STATES of America,
Plaintiff–Appellee,

v.

Louis ROCHESTER,
Defendant–Appellant.

Nos. 88–7037, 89–1068.

United States Court of Appeals,
Fifth Circuit.

April 6, 1990.
Rehearing and Rehearing En Banc
Denied May 11, 1990.

John H. Hagler, Dallas, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., Philip Police, and W. Ray Jahn, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, JOHNSON and DUHÉ, Circuit Judges.

JOHNSON, Circuit Judge:

Louis Rochester was charged in a twenty-five count indictment with various violations of federal law stemming from a loan commitment by an Odessa, Texas, savings and loan. The indictment included a forfeiture provision pursuant to 18 U.S.C. § 1963.

A jury found Rochester guilty of four counts. Specifically, Rochester was convicted of Count 16 (mail fraud in violation of 18 U.S.C. § 1341), Count 17 (misapplication of funds of a federally insured institution in violation of 18 U.S.C. § 657), Count 18 (false entry in a loan record in violation of 18 U.S.C. § 1006) and Count 19 (fraudulent participation in a loan transaction in violation of 18 U.S.C. § 1006). Punishment was assessed at five years' probation as to all four counts, ordered to run concurrently. Additionally, the court ordered Rochester to make restitution in the amount of $15,453.70. The court also ordered Rochester to pay a fine, perform community service and reside for six months in alternative housing. Rochester timely appealed to this Court.

At the sentencing hearing, the trial judge stated that the Federal Savings and Loan Insurance Corporation (hereinafter FSLIC) had requested entry of an order of restitution. The trial court ultimately entered such an order, over Rochester's objection, directing that Rochester pay to the FSLIC the sum of $7,180,099.46. Rochester timely appealed from this order.

## I. BACKGROUND

The facts established at trial outline appellant Rochester's involvement in Odessa Savings (hereinafter referred to as Odessa). Rochester was an early board member of Odessa, stepping into that position in 1959. By 1974, Rochester owned in excess of ten percent of the stock of Odessa. During that year, Odessa sought to participate in a joint venture land development project. The land was to be developed by Rochester. Because of the Federal Home Loan Bank Board's (FHLBB) prohibition against members of the board of a savings and loan placing themselves in positions raising a potential conflict of interest, Odessa sought authority to participate in the transaction from the FHLBB. In the course of seeking this authorization, A.H. "Happy" Dyer, Odessa's chief executive officer, disclosed to the FHLBB the personal interest of Rochester.

The FHLBB's ultimate approval was conditioned, among other things, on the resignation of Rochester as a director and on Rochester divesting himself of enough stock to reduce his sharehold to less than ten percent. After his resignation from the board, Rochester was permitted to remain as an advisory director. Furthermore, the testimony and evidence produced at trial indicate that Rochester did not fully sever his ties to a more than ten percent ownership share of Odessa. Instead, Rochester transferred his excess stock to associates or to his son, each of whom held it for Rochester's benefit. These transferees paid the dividends received on the stock to Rochester, and conveyed the stock back to Rochester upon his request.

Over the next ten years, Odessa entered into numerous joint venture agreements with Rochester. Odessa provided the financing for these ventures and Rochester acted as the managing partner. To facilitate Odessa's joint venture activities, Mid–Central Financial Group, Incorporated was formed in 1981 to hold all the stock in Odessa. Prior to the formation of Mid–Central, a director borrowing from Odessa in connection with a real estate transaction in which he held an interest was limited by

applicable federal regulations to ten percent; sometime subsequent to the formation of Mid–Central, that figure was increased to twenty-five percent. In 1981, Rochester held eight percent of Odessa's stock in his own name. In 1984, Rochester owned twenty-three percent of Mid–Central stock in his own name.

The charges in the instant case stem from a series of transactions commencing in 1984. In that year, James Pruett, a real estate developer in Arlington, Texas, contacted Rochester regarding Odessa's willingness to participate in a land development project. Pruett's project, "Stagecoach Estates," consisted of 110 acres to be developed as single family residences.

On April 18, 1984, subsequent to Rochester's initial contact with Pruett concerning the Stagecoach venture, a report of examination by the Texas Savings and Loan Department was presented to Odessa. This report indicated that Odessa had exceeded its loan limit to a single borrower and indicated that Rochester could borrow no more money from Odessa. Rochester, as the director charged with reviewing reports from federal and state examiners, presented this report to the Odessa Board.

At or around May of 1984, Rochester approached David Baum, then president of Odessa, about the possibility of Odessa entering into the Stagecoach development project which was ostensibly owned by Pruett. Rochester did not indicate any personal involvement on his part. In late May of 1984, the board adopted a resolution authorizing Odessa to grant a loan to and enter into a profit sharing agreement with Pruett.

Though present at the meeting at which the resolution passed, Rochester did not disclose his interest. The board members later testified that they had no knowledge that Rochester was to have a twenty-five percent interest in the project, believing that only Pruett and his company were involved. At one early board meeting, another director asked Rochester if, because of his expertise in such matters, Rochester might oversee the project and look after Odessa's interest. Rochester agreed but did not disclose his personal interest. On another occasion, Baum specifically asked Rochester if he had any interest in Stagecoach. Rochester replied that the entire interest was Pruett's.

Pruett and Odessa signed a letter of intent on May 30, 1984. A commitment letter was signed by Baum for Odessa Savings on July 12, 1984, and sent to Pruett. Pruett then began the initial work to develop the property. At one point during that summer, Pruett and Rochester executed an agreement splitting Pruett's interest in Stagecoach Estates between himself and Rochester. This split included both the profits and the obligations. This agreement was signed on the day of the closing of the loan and participation agreement, August 13, 1984. Odessa committed to loan Pruett's company $8 million, and entered into a fifty percent participation agreement. Pruett, whose financial statements reflected assets in excess of a million dollars, personally guaranteed the loan. Odessa officials were unaware of the side agreement between Pruett and Rochester.

Throughout the development process, Baum received periodic financial information from Michael Dulle, Pruett's chief financial officer. Dulle submitted these reports on a regular basis at Rochester's request. The payment of a profit-share to Rochester was reflected in the financial report for April of 1986. When Baum received this report, he sent it to Dyer, still Chairman of the Board, redlining the disbursement to Rochester. When Baum questioned Pruett as to the payment, Pruett indicated that it was a management fee.

After the closing, Baum approved the funding requests on the project as Pruett submitted them. As of the date of trial, roughly $7,500,000 had been drawn on the loan commitment. The project proved not to be profitable, and James Pruett Construction owed approximately $6,000,000 in principal and $1,000,000 in interest to Odessa.

Rochester was charged in a twenty-five count indictment with various violations of federal law. After he entered a plea of not

guilty, the case proceeded before a jury. The jury acquitted Rochester on all but the four counts previously enumerated. The district court sentenced Rochester and ordered restitutionary relief in favor of the FSLIC.

Rochester asserts twelve grounds of error in this appeal encompassing challenges to the sufficiency of the evidence, challenges to the jury instructions, a double jeopardy challenge and challenges to the propriety of the restitutionary awards.[1]

We address each of these areas in turn.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

In ruling on a challenge to the sufficiency of the evidence, this Court must examine the evidence in the light most favorable to the Government with all reasonable inferences and credibility choices made in favor of the verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). If the evidence, when viewed in this light, is such that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this Court must affirm. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979).

In Count 16 of the indictment, the Government alleged that Rochester attempted to defraud the United States by executing a side agreement with Pruett and subsequently concealing from Odessa the one-half of Pruett's interest which was conveyed to Rochester. Specifically, the Government charged that Rochester committed the offense of mail fraud by causing a "loan commitment letter from Odessa Savings to James Pruett" to be mailed in violation of 18 U.S.C. § 1341. In Count 17, the Government alleged that Rochester misapplied monies and funds totalling ap-

proximately $8 million in violation of 18 U.S.C. § 657. In Count 18, the Government alleged that Rochester caused to be made a false entry relating to the loan agreement between Pruett and Odessa in that the association records failed to disclose that Rochester was to participate in the benefits of the loan in the amount of twenty-five percent. Finally, in Count 19, the Government alleged that Rochester participated in the monies and profits through a loan transaction totalling approximately $8 million in connection with the Stagecoach development in violation of 18 U.S.C. § 1006.

Rochester makes two challenges to the sufficiency of the evidence produced at trial to support the convictions on these four counts. First, he argues that the evidence is insufficient to prove a scheme to defraud or a fraudulent transaction. Second, he argues that the Government failed to prove that Rochester acted with the requisite mental state.

### *Mail Fraud*

■ In order to establish a violation of 18 U.S.C. § 1341, the Government must prove the existence of a scheme to defraud that involved the use of the mails for the purpose of executing the scheme. The defendant's specific intent to commit fraud must also be established. *United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). In *Fagan*, this Court indicated that this section is violated where an employee "violates his duty to disclose to his employer economically material information which the 'employee has reason to believe ... would lead a reasonable employer to change its business conduct.'" *Id.* at 1009 (citation omitted). Under the instant facts, Odessa had been specifically ordered to not lend any more money to Rochester. Had Odessa known about Rochester's interest in the project, Odessa

---

1. As a threshold matter, we address the Government's argument that this Court has jurisdiction only over the appeal from the second order of restitution. We do not agree. Although the second notice of appeal filed by Rochester indicates only that the appeal is from the second imposition of restitution, this is not fatal to Rochester's appeal. Failure to properly designate the order appealed from is not a jurisdictional defect, and may be cured by an indication of intent in the briefs or otherwise. *See, e.g., Torres v. Oakland Scavenger*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).

would not have been able to make the loan. Record Vol. 6 at 72.[2] The loan could not have been made to Rochester alone, nor could it have been made to Rochester and Pruett. Rochester's misstatement to Baum about the existence of his (Rochester's) interest in the project supports the jury's finding of a scheme to defraud. Similarly, Rochester's argument that the Government failed to prove that he had the requisite mental state to be convicted of mail fraud is without merit. The Government must show that the defendant willfully participated in a scheme with the intent that the scheme's illicit objectives be achieved. *United States v. Bailey*, 859 F.2d 1265 (7th Cir.1985), *cert. denied sub nom. Ticktin v. United States*, — U.S. —, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). Our review of the record indicates that there is no question but that Rochester had the specific intent to commit this violation.[3]

■ Rochester also argues that the Government failed to demonstrate that the use of the mail occurred in furtherance of the alleged scheme. Rochester bases his argument on the alleged lack of evidence that an agreement between Pruett and Rochester existed prior to the time the July 12, 1984, commitment letter was mailed from Odessa to Pruett. Rochester's argument is misplaced.

In order to establish this element, "the thing mailed [must be] an integral part of execution of the scheme so that the use of the mails was in this way 'incident to an essential part of the scheme.'" *United States v. Kent*, 608 F.2d 542 (5th Cir.1979), *cert. denied sub nom. Patrick Petroleum Company v. United States*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). The Government at trial proved the existence of

the July 12 commitment letter sent to Pruett from Odessa and signed by Baum. The Government further established that Rochester caused this letter to be sent as part and parcel of Rochester's scheme to defraud. Rochester has not been convicted of conspiracy to commit mail fraud; the actions and use of the mails established at trial are sufficient to establish the violation with which Rochester has been convicted.

### Misapplication of Funds

■ Rochester argues that the Government has failed to prove that Rochester knowingly and willfully misapplied funds belonging to Odessa. Rochester argues that the funds were not misapplied because they were lent to a creditworthy debtor. Rochester places significant reliance on the case of *United States v. Gens*, 493 F.2d 216 (1st Cir.1974). In *Gens*, the court concluded that no misapplication of funds occurs where the loan is made to a creditworthy individual who assumes the responsibility to repay the loan. *Gens*, however, is not directly on point with the instant case. *United States v. Krepps*, 605 F.2d 101 (3d Cir.1979), is more aligned with the instant facts. In *Krepps*, the Third Circuit, after examining the history of the statutory section and other circuit opinions on the issue, reasoned that a misapplication has occurred where, as here, money is lent to a creditworthy individual who in turn lends the money to a party to whom the institution could not have originally extended credit, such as an officer of the institution. In the instant case, Odessa was prohibited from lending any further funds to Rochester. Applying the reasoning of *Krepps*, we conclude that misapplication of the

---

**2.** It is this prohibition on Odessa's ability to participate in the transaction that sets this case apart from *United States v. Ballard*, 663 F.2d 534 (5th Cir.1981), *as modified on reh'g*, 680 F.2d 352 (5th Cir.1982), upon which Rochester relies. In *Ballard*, this Court held that a kickback scheme was not a scheme to defraud because the employers could not have charged higher prices under the existing federal law. The Court noted that merely violating a fiduciary duty is not the equivalent of a scheme to defraud. This opinion does not alter that sound principal. Rather, in the instant case, we note

the existence of additional, distinguishing facts —specifically, the existence of a direct prohibition on the ability of Odessa to act (of which Rochester was aware) which Rochester, through action and deceit, attempted to circumvent.

**3.** In regard to the specific intent element of all of the crimes charged, we have reviewed the record and conclude that there is sufficient evidence to establish Rochester's intent. Consequently, we do not again address this issue in the body of this opinion.

funds has been established despite the apparent creditworthiness of Pruett.

■ Rochester argues that there is an alternative basis for finding that he did not misapply the funds. In *United States v. McCright*, 821 F.2d 226 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988), this Court held that in order to violate 18 U.S.C. § 656, the defendant bank agent must make or significantly influence the decision to extend the loan. We need not decide if this analysis should be applied to violations of section 657 because there is sufficient evidence to find that Rochester did in fact act in such a manner. Rochester's business acumen was highly respected and often relied upon by his fellow board members. In fact, in the context of this transaction, one of the board members asked Rochester to watch out for Odessa's interest in the project. Further, Rochester brought the project to Odessa, discussed the project at length, and encouraged Odessa's participation in the transaction. There is sufficient evidence to support a conviction for misapplication of funds.

### False Entries and Fraudulent Participation in a Loan Transaction

■ Rochester argues that the evidence is insufficient to convict him of violating 18 U.S.C. § 1006 because the entry was not false since the loan was made to Pruett. However, we note that Rochester failed to disclose his interest in the loan. Rochester was aware of his interest in the project prior to the time of closing. Under the facts of this case, this failure to disclose is sufficient to establish the element of false entry.

■ Rochester also argues that the Government failed to establish the offense of fraudulent participation in a loan transaction in violation of 18 U.S.C. § 1006. Section 1006 makes it a crime for an agent of an institution insured by the FSLIC to participate in and obtain benefits through any transaction of the institution. The record evidence is clearly sufficient to support Rochester's conviction.

### B. *Jury Instructions*

■ A district court's refusal to include a defendant's proposed jury instruction in the charge is reviewed under an abuse of discretion standard, and the trial judge is afforded substantial latitude in formulating his instructions. This Court will not find an abuse of discretion where the instructions fairly and adequately cover the issues presented by the case. *United States v. Mollier*, 853 F.2d 1169 (5th Cir. 1988). Where the complaint is that the trial court has refused to give an instruction, this Court must determine whether the requested instruction is a correct statement of the law, whether the instruction was substantially given in the charge as a whole, and whether the instruction concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense. *Id.*

Rochester claims that the district court erred by failing to instruct the jury on a good faith defense, by failing to instruct on specific intent and by instructing the jury on Rochester's fiduciary duty. We perceive no reversible error as to any of these points.

### Good Faith

■ In the context of Count 16, mail fraud, Rochester argues that the district court erred in failing to submit a requested good faith instruction. In *United States v. Goss*, 650 F.2d 1336, 1344 (5th Cir.1981), this Court held that "good faith is a complete defense to the charge of intent to defraud under the mail fraud statute." In *Goss*, this Court reversed the conviction because of the district court's failure to instruct the jury on good faith. *Goss*, however, must be read in light of later cases which indicate that the failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury. *United States v. Hunt*, 794 F.2d 1095 (5th Cir. 1986).

In the instant case, the trial court defined willfully as an act committed "volun-

tarily and purposefully, with specific intent to disobey or disregard the law" and defined specific intent as requiring the Government to prove that "the Defendant in question knowingly did an act which the law forbids, purposely intending to violate the law." Record Vol. 10 at 133. Rochester was given full latitude to testify concerning his good faith and to argue his good faith to the jury. Faced with this evidence, the jury could only find specific intent after taking the evidence regarding good faith into account. As this Court has indicated, "a finding of specific intent to deceive categorically excludes a finding of good faith." *United States v. Lavergne*, 805 F.2d 517 (5th Cir.1986); *see also United States v. Chenault*, 844 F.2d 1124 (5th Cir.1988). Taken as a whole, the instructions to the jury were adequate; no reversible error has been shown.[4]

■ Rochester also argues that this Court must reverse the district court because the instructions for Counts 17 (misapplication of funds), 18 (false entry), and 19 (fraudulent participation) failed to define intent to defraud in a separate instruction on each count. On the misapplication count, the court instructed the jury as follows:

> To willfully misapply money or property of the .... institution means an intentional conversion of such money or property to one's own use and benefit, or to the use and benefit of another, knowing that one had no right to do so.
> ... The test is whether or not Odessa Savings was defrauded of something, defrauded of its right to have custody of its funds, or the right of the bank to make its own decisions as to how those funds were to be used.

**4.** As will be set out below, the court adequately instructed the jury regarding the specific intent requirement for Counts 17, 18, and 19. Because Rochester had adequate opportunity to argue and testify to his good faith, the court did not err in failing to submit a specific instruction as to good faith in the context of these three counts.

**5.** In the Pattern Jury Instruction for 18 U.S.C. § 656 (Theft or Embezzlement by Bank Employee), misapplication is defined as

Record Vol. 10 at 138–39. This instruction is substantially similar to the Pattern Jury Instruction for this Circuit.[5] In both, the jury is required to find that the defendant intentionally converted the funds to his own use or the use of another with intent to defraud. In light of Rochester's opportunity to fully argue specific intent to the jury, we cannot say that, under the totality of the circumstances, reversible error has been committed. *See Mollier*, 853 F.2d 1169.

■ Nor do we find reversible error as to the instructions on the false entry and fraudulent participation counts. The jury was instructed that it had to find that Rochester acted "intending to cheat or deceive" the association, its officers, or agents, the United States or any agency thereof, including the FHLBB. Record Vol. 10 at 141. Taking the jury instructions as a whole, this instruction was sufficient to instruct the jury on the specific intent requirement. *See United States v. Adamson*, 700 F.2d 953 (5th Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983).

### Fiduciary Relationship

■ Rochester's argument that the district court's definition of a fiduciary relationship permitted the jury to convict based on Odessa's loss of intangible rights fails when juxtaposed with the totality of the instructions given on the fiduciary duty issue. *See McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The court specifically instructed the jury that

> [a] lapse of fiduciary duty owed by an agent to a principal does not in and of itself amount to a violation .... A

... a willful conversion or taking by a bank employee of such money or property to his own use and benefit, or the use and benefit of another, whether or not such money or property has been intrusted to his care, and with the intent to defraud the bank.

To act with "intent to defraud" means to act with intent to deceive or cheat, ordinarily for the purpose of causing a financial loss to someone else or bringing about a financial gain to one's self.

breach of fiduciary duty can only constitute a violation of these statutes if the government proves beyond a reasonable doubt that the breach caused some detriment to a monetary or property right of the principal.

Record Vol. 10 at 136–37. Such an instruction belies Rochester's contention of error.

### C. *Double Jeopardy*

 Rochester argues that the misapplication count and the fraudulent participation count are multiplicitious, and that the sentences violate his right not to be punished more than once for the same crime. The Government responds that concurrent sentences were imposed for these offenses and, therefore, this argument need not be addressed under the concurrent sentences doctrine. *See, e.g., United States v. Stovall,* 825 F.2d 817 (5th Cir. 1987). Because we conclude that the offenses of misapplication of funds (18 U.S.C. § 657) and fraudulent participation in the benefits of a loan (18 U.S.C. § 1006) are different offenses for purposes of double jeopardy, we need not address the application of *Stovall.*

The Double Jeopardy Clause of the Fifth Amendment protects against multiple punishments for the same offense. In 1937, the Supreme Court set out the test for determining if two offenses are the same for double jeopardy purposes. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1937). The Court stated:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact that the other does not.

*Id.* 52 S.Ct. at 182. Applying this test to the offenses in the instant case, we conclude that the offenses are not the same. In order to willfully misapply, an individual must take some affirmative action to influence the institution's decision. *United States v. McCright,* 821 F.2d 226 (5th Cir. 1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). The participation portion of section 1006 regulates the officer *after* the loan has been granted *regardless* of whether he influenced the loan prior to its making. In *United States v. Hickey,* the Seventh Circuit recognized that there are essential distinctions between these two offenses. 360 F.2d 127, 145 (7th Cir.1966). We agree and conclude that sections 657 and 1006 are separate offenses for purposes of double jeopardy.[6]

### D. *Restitution*

The district court found that Rochester was obligated to make full restitution to the FSLIC[7] under the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3579–80. Specifically, Rochester was ordered to pay $7,180,099.46, the amount due on the loan as of December 6, 1989, and post-judgment interest.[8]

Rochester makes several challenges to this order of restitution including claims that (1) his due process rights were violated because the order of restitution was entered in the absence of an evidentiary hearing; (2) the entry of the restitution award was improper because there was no factual basis to support the order; (3) the order was improper because it was imposed in violation of his seventh amendment right to

**6.** Rochester urges this Court to follow our earlier opinion in *United States v. Kehoe,* 573 F.2d 335 (5th Cir.), *vacated on other grounds,* 579 F.2d 971 (5th Cir.1978), in which we held that the two offenses in question proscribed the same conduct such that successive prosecutions would violate double jeopardy. This holding in *Kehoe* no longer has precedential effect. In *Stovall,* 825 F.2d at 822, a panel of this Court, in reaching the result we reach today, indicated that the value of the *Kehoe* language was questionable. We recognize that there are important distinctions between the conduct required to violate each of these statutes such that they are more properly characterized as separate offenses pursuant to the *Blockburger* analysis.

**7.** Odessa was declared insolvent on October 14, 1988. The district court found that the FSLIC, having acquired the claims of Odessa against Rochester, was the proper party to seek restitution. Order For Restitution at 1.

**8.** The district court made Rochester's obligation contingent on FSLIC's willingness to assign to Rochester the interest which Odessa had in the Stagecoach project.

trial by jury; (4) the court erred by including an award of interest; and (5) the award violates the double jeopardy clause. We address these issues in turn.

*Evidentiary Hearing*

■ Rochester's contention that the imposition of the order ran afoul of due process is not meritorious. The VWPA does not require an oral hearing in order for the court to determine whether restitution should be awarded and the amount thereof. In *United States v. Hughey*, this Court adopted the reasoning of the Ninth Circuit in concluding that the legislative history of the VWPA gives no indication of any intent on the part of Congress to transform the sentencing hearing into a second trial on the issue of restitution. 877 F.2d 1256 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 716, 107 L.Ed.2d 736 (1989) (citing *United States v. Cloud*, 872 F.2d 846 (9th Cir. 1989)). The VWPA does require that some sort of hearing be held, but it should be a summary one so as not to unduly complicate and prolong the sentencing process. 18 U.S.C. § 3663(d).

Rochester acknowledges that the trial court is not required to engage in a full-blown evidentiary hearing. Rochester, contends, however, that no hearing was had in the instant case. This allegation mischaracterizes the proceedings. Three days prior to the sentencing hearing, the district court received a letter brief from the FSLIC requesting that Rochester be ordered to pay full restitution. At the December 12 sentencing hearing, this letter was tendered to Rochester who was given time to respond. On December 27, Rochester filed his response to the FSLIC's letter. Clearly, Rochester was given notice and an opportunity to be heard on the restitution issue. This is sufficient for due process purposes in the instant case. *See United States v. Kail*, 804 F.2d 441 (8th Cir.1986).

■ Although a defendant must be afforded some degree of due process at sentencing, the same degree of process is not required at sentencing as at trial. In the instant case, Rochester was given notice and an opportunity to be heard. The six issues which Rochester argues should have been addressed in the context of an evidentiary hearing were foreclosed by the jury verdict.[9] This case does not present a situation where the issue of restitution rests upon a credibility determination. In such a situation, the result might be different. The posture of the instant case, however, indicates that Rochester received all the process that was due.

Rochester also contends that the district court erred by entering an order of restitution in the absence of an evidentiary hearing on Rochester's ability to pay. Rochester's allegation that there was no evidence before the court as to his current financial capability to make the restitution is belied by the record which indicates that Rochester's assets exceeded the amount of the restitution order.[10] The district court was entitled to consider that evidence when sentencing. Furthermore, Rochester did not meet his burden of demonstrating lack

---

9. Rochester argues that he was denied his due process right to present evidence and testimony on the following issues regarding whether the trial court could enter an order of restitution:

 1. Legal relationship, rights and obligations of Pruett, Rochester and Odessa Savings under the Stagecoach Estates loan documents, the profits participation agreement and the agreement between Pruett and Rochester;

 2. Evidence showing that Rochester caused Odessa Savings to make a loan it otherwise would not have made;

 3. Whether Odessa Savings has lost money on the Stagecoach Estates loan;

 4. Whether Rochester devised a scheme to cause Odessa Savings to make a loan;

 5. Whether Rochester could not have borrowed money in his own name from Odessa Savings at the time the Stagecoach loan was made; and

 6. Whether Rochester acting alone, or in concert with another, ever attempted to or did exert control over lending decisions of Odessa Savings.

Appellant's Brief at 39–40.

10. The Government introduced evidence, including tax returns, showing that Rochester's assets far exceeded the amount of the restitution. As of January 1, 1987, Rochester had $5,000,000 in cash on hand and at the time of trial, Rochester's joint ventures with Pruett alone had assets totalling $150,000,000 to $200,-000,000.

of financial resources. *See Hughey*, 877 F.2d at 1265. Rochester made no allegation before the trial court of inability to pay, nor does he make such an allegation now. Absent such an allegation, the district court was not required to hold an evidentiary hearing on this issue.

*Factual Basis*

■ Rochester's assertion that there is no factual basis for the order of restitution is without merit. *See United States v. Brown*, 699 F.2d 704 (5th Cir.1983). The Government introduced an affidavit establishing the amount due on the loan. Supplemental Record at 32–35. This affidavit is sufficient to satisfy the *Brown* requirement for a factual basis. *See, e.g., United States v. Matt*, 838 F.2d 1356 (5th Cir.), *cert. denied*, 486 U.S. 1035, 100 L.Ed.2d 607 (1988).

Because Rochester's argument can fairly be construed as a challenge to the sufficiency of the evidence to support the order of restitution, we address that issue as well. Pursuant to 18 U.S.C. § 3664(a), "[t]he court, in determining whether to order restitution ..., shall consider the amount of the loss sustained by any victim ... [and] the financial resources of the defendant." A dispute as to the proper amount of restitution is resolved by the court by a preponderance of the evidence. The Government bears the burden of establishing the amount of the loss, while the defendant bears the burden of demonstrating the lack of adequate financial resources. 18 U.S.C. § 3664(d). In the instant case, the Government satisfied its burden through the use of the affidavit. Rochester, in his brief, in no way controverts this affidavit. Further, Rochester has failed to introduce any evidence as to his financial status, an element on which he has the burden of proof. The evidence, including the affidavit and evidence of Rochester's financial status, was sufficient to support the restitution award.

*Jury Trial*

■ The VWPA provides that both the United States and the victim can enforce a restitution order in "the same manner as a judgment in a civil action." 18 U.S.C. § 3663(h). Additionally, the statute provides that a conviction for an offense giving rise to the restitutionary provisions of the VWPA estops the defendant from denying the essential allegations of the offense in a subsequent civil proceeding. 18 U.S.C. § 3664(e). Rochester argues that these provisions indicate the civil nature of the VWPA; assuming such civil nature, Rochester contends that the statute violates the seventh amendment right to trial by jury.

The VWPA's provisions are not indicators of the civil nature of that statute, but, rather, are devices which enhance the enforceability of the restitutionary order.

> The legislative history confirms that the enforcement provision was enacted to "increase[ ]the victim's chances of collecting restitution," Senate Report at 33, 1982 U.S. Code Cong. & Ad. News at 2539. The enforcement provisions of the VWPA parallel existing law for the collection of fines.

*United States v. Brown*, 744 F.2d 905, 910 (2d Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). We cannot conclude that by aiding the enforceability of a restitution order, Congress intended to transform that restitution order into a civil judgment. Consequently, Rochester's seventh amendment argument fails.

*Interest*

■ The district court ordered Rochester to pay $7,180,099.46, which is the amount owing on the loan as of December 6, 1989, and all interest accruing from that date until the date of payment. The figure includes $6,147,290.47 in outstanding balance and $1,032,808.92 in accrued interest as of the established date. Rochester, relying on this Court's opinion in *United States v. RICO Industries, Inc.*, 854 F.2d 710 (5th Cir.1988), *cert. denied sub nom. Wilkins v. United States*, — U.S. —, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989), argues that the inclusion of pre- and postjudgment interest in the award was error.

*RICO*, decided under the Federal Probation Act (FPA), contains broad language supporting Rochester's position. Relying

on *Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947), and *United States v. Sleight*, 808 F.2d 1012 (3d Cir. 1987), the panel in *RICO* concluded that "[r]estitution is a criminal penalty. Criminal penalties do not bear interest." *RICO* at 714. None of these three opinions, however, fully supports Rochester's argument that interest may not be awarded under the VWPA.

Under our interpretation of *Rodgers*, both pre- and postjudgment interest may be awarded under the VWPA.[11] In *Rodgers*, the Supreme Court noted that the statute under review, like the VWPA, said nothing about interest. The Court, therefore, devised a test for determining if interest should be awarded.

> [I]n the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in light of general principles....
>
> As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed ... should be fairly compensated....

332 U.S. at 373, 68 S.Ct. at 7.

In *Rodgers*, the Supreme Court, applying this test to a statute[12] imposing an obligation in the nature of a penalty, concluded that the Government does not suffer a money loss if a criminal fine is not paid promptly. A fine serves to deter the prohibited conduct regardless of whether interest is imposed. Similarly, in *RICO*, this

Court concluded that interest was improper under the FPA where the restitution order was imposed as a condition of probation.

The restitution imposed pursuant to the VWPA, unlike restitution under the FPA or the Agriculture Adjustment Act, is not in the nature of a fine. Rather, the purpose of the VWPA is "to ensure that wrongdoers, to the degree possible, make their victims whole." *Hughey*, 877 F.2d at 1261. This purpose is effectuated by the payment of the fine to the victim rather than the Government. We conclude that the purpose of the VWPA would be served by the inclusion of interest in the judgment. The award of such interest was proper.

### III. CONCLUSION

After reviewing each of Rochester's contentions in turn, we are convinced that reversible error has not been shown. The conviction and sentence are therefore affirmed.

AFFIRMED.

---

**11.** *Sleight* presents Rochester's strongest argument. Under the reasoning of that case, prejudgment interest is impermissible under the FPA because the statute did not expressly provide for such interest and courts should be hesitant to expand legislatively described relief. However, once a penalty has been reduced to

judgment, "it does not differ in essence from a judgment arising out of civil proceedings," and postjudgment interest is therefore permissible. *Id.*, 808 F.2d at 1020.

**12.** The Court was interpreting the Agricultural Adjustment Act of 1938.